Justice Kennedy
delivered the opinion of the Court.
This case arises from serious constitutional violations in California’s prison system. The violations have persisted for years. They remain uncorrected. The appeal comes to this Court from a three-judge District Court order directing California to remedy two ongoing violations of the Cruel and Unusual Punishments Clause, a guarantee binding on the States by the Due Process Clause of the Fourteenth Amend- *500 men! The violations are the subject of two class actions in two Federal District Courts. The first involves the class of prisoners with serious mental disorders. That case is Coleman v. Brown. The second involves prisoners with serious medical conditions. That ease is Plata v. Brown. The order of the three-judge District Court is applicable to both cases.
After years of litigation, it became apparent that a remedy for the constitutional violations would not be effective absent a reduction in the prison system population. The authority to order release of prisoners as a remedy to cure a systemic violation of the Eighth Amendment is a power reserved to a three-judge district court, not a single-judge district court. 18 U. S. C. § 3626(a). In accordance with that rule, the Coleman and Plata District Judges independently requested that a three-judge court be convened. The Chief Judge of the Court of Appeals for the Ninth Circuit convened a three-judge court composed of the Coleman and Plata District Judges and a third, Ninth Circuit Judge. Because the two cases are interrelated, their limited consolidation for this purpose has a certain utility in avoiding conflicting decrees and aiding judicial consideration and enforcement. The State in this Court has not objected to consolidation, although the State does argue that the three-judge court was prematurely convened. The State also objects to the substance of the three-judge court order, which requires the State to reduce overcrowding in its prisons.
The appeal presents the question whether the remedial order issued by the three-judge court is consistent with requirements and procedures set forth in a congressional statute, the Prison Litigation Reform Act of 1995 (PLRA). 18 U. S. C. § 3626; see Appendix A, infra. The order leaves the choice of means to reduce overcrowding to the discretion of state officials. But absent compliance through new construction, out-of-state transfers, or other means — or modification of the order upon a further showing by the State— *501 the State will be required to release some number of prisoners before their full sentences have been served. High recidivism rates must serve as a warning that mistaken or premature release of even one prisoner can cause injury and harm. The release of prisoners in large numbers — assuming the State finds no other way to comply with the order — is a matter of undoubted, grave concern.
At the time of trial, California’s correctional facilities held some 156,000 persons. This is nearly double the number that California’s prisons were designed to hold, and California has been ordered to reduce its prison population to 137.5% of design capacity. By the three-judge court’s own estimate, the required population reduction could be as high as 46,000 persons. Although the State has reduced the population by at least 9,000 persons during the pendency of this appeal, this means a further reduction of 37,000 persons could be required. As will be noted, the reduction need not be accomplished in an indiscriminate manner or in these substantial numbers if satisfactory, alternative remedies or means for compliance are devised. The State may employ measures, including good-time credits and diversion of low-risk offenders and technical parole violators to community-based programs, that will mitigate the order’s impact. The population reduction potentially required is nevertheless of unprecedented sweep and extent.
Yet so too is the continuing injury and harm resulting from these serious constitutional violations. For years the medical and mental health care provided by California’s prisons has fallen short of minimum constitutional requirements and has failed to meet prisoners’ basic health needs. Needless suffering and death have been the well-documented result. Over the whole course of years during which this litigation has been pending, no other remedies have been found to be sufficient. Efforts to remedy the violation have been frustrated by severe overcrowding in California’s prison system. Short-term gains in the provision of care have been *502 eroded by the long-term effects of severe and pervasive overcrowding.
Overcrowding has overtaken the limited resources of prison staff; imposed demands well beyond the capacity of medical and mental health facilities; and created unsanitary and unsafe conditions that make progress in the provision of care difficult or impossible to achieve. The overcrowding is the “primary cause of the violation of a Federal right,” 18 U. S. C. § 3626(a)(B)(E)(i), specifically the severe and unlawful mistreatment of prisoners through grossly inadequate provision of medical and mental health care.
This Court now holds that the PLRA does authorize the relief afforded in this case and that the court-mandated population limit is necessary to remedy the violation of prisoners’ constitutional rights. The order of the three-judge court, subject to the right of the State to seek its modification in appropriate circumstances, must be affirmed.
I
A
The degree of overcrowding in California’s prisons is exceptional. California’s prisons are designed to house a population just under 80,000, but at the time of the three-judge court’s decision the population was almost double that. The State’s prisons had operated at around 200% of design capacity for at least 11 years. Prisoners are crammed into spaces neither designed nor intended to house inmates. As many as 200 prisoners may live in a gymnasium, monitored by as few as two or three correctional officers. App. 1337-1338, 1350; see Appendix B, infra. As many as 54 prisoners may share a single toilet. App. 1337.
The Corrections Independent Review Panel, a body appointed by the Governor and composed of correctional consultants and representatives from state agencies, concluded that California’s prisons are “ ‘severely overcrowded, imperiling the safety of both correctional employees and in *503 mates.’ ”[1] App. to Juris. Statement, O. T. 2009, No. 09-416, p. 56a (hereinafter Juris. App.). In 2006, then-Governor Schwarzenegger declared a state of emergency in the prisons, as “ ‘immediate action is necessary to prevent death and harm caused by California’s severe prison overcrowding.’” Id., at 61a. The consequences of overcrowding identified by the Governor include “ ‘increased, substantial risk for transmission of infectious illness’ ” and a suicide rate “ ‘approaching an average of one per week.’ ” Ibid.
Prisoners in California with serious mental illness do not receive minimal, adequate care. Because of a shortage of treatment beds, suieidal inmates may be held for prolonged periods in telephone-booth-sized cages without toilets. See *504 Appendix C, infra. A psychiatric expert reported observing' an inmate who had been held in such a cage for nearly 24 hours, standing in a pool of his own urine, unresponsive and nearly catatonic. Prison officials explained they had “ 'no place to put him.’ ” App. 593. Other inmates awaiting care may be held for months in administrative segregation, where they endure harsh and isolated conditions and receive only limited mental health services. Wait times for mental health care range as high as 12 months. Id., at 704. In 2006, the suicide rate in California’s prisons was nearly 80% higher than the national average for prison populations; and a court-appointed Special Master found that 72.1% of suicides involved “some measure of inadequate assessment, treatment, or intervention, and were therefore most probably foreseeable and/or preventable.”[2] Id., at 1781.
Prisoners suffering from physical illness also receive severely deficient care. California’s prisons were designed to meet the medical needs of a population at 100% of design capacity and so have only half the clinical space needed to treat the current population. Id., at 1024. A correctional officer testified that, in one prison, up to 50 sick inmates may be held together in a 12- by 20-foot cage for up to five hours awaiting treatment. Tr. 597-599. The number of staff is *505 inadequate, and prisoners face significant delays in access to care. A prisoner with severe abdominal pain died after a 5-week delay in referral to a specialist; a prisoner with “ ‘constant and extreme’ ” chest pain died after an 8-hour delay in evaluation by a doctor; and a prisoner died of testicular cancer after a “failure of MDs to work up for cancer in a young man with 17 months of testicular pain.”[3] California Prison Health Care Receivership Corp., K. Imai, Analysis of CDCR Death Reviews 2006, pp. 6-7 (Aug. 2007). Doctor Ronald Shansky, former medical director of the Illinois state prison system, surveyed death reviews for California prisoners. He concluded that extreme departures from the standard of care were “widespread,” Tr. 430, and that the proportion of “possibly preventable or preventable” deaths was “extremely high,” id., at 429.[4] Many more prisoners, suffering *506 from severe but not life-threatening conditions, experience prolonged illness and unnecessary pain.
B
These conditions are the subject of two federal cases. The first to commence, Coleman v. Brown, was filed in 1990. Coleman involves the class of seriously mentally ill persons in California prisons. Over 15 years ago, in 1995, after a 39-day trial, the Coleman District Court found “overwhelming evidence of the systemic failure to deliver necessary care to mentally ill inmates” in California prisons. Coleman v. Wilson, 912 F. Supp. 1282, 1316 (ED Cal.). The prisons were “seriously and chronically understaffed,” id., at 1306, and had “no effective method for ensuring . . . the competence of their staff,” id., at 1308. The prisons had failed to implement necessary suicide-prevention procedures, “due in large measure to the severe under staffing.” Id., at 1315. Mentally ill inmates “languished for months, or even years, without access to necessary care.” Id., at 1316. “They suffer from severe hallucinations, [and] they decompensate into catatonic states.” Ibid. The court appointed a Special Master to oversee development and implementation of a remedial plan of action.
*507 In 2007,12 years after his appointment, the Special Master in Coleman filed a report stating that, after years of slow improvement, the state of mental health care in California’s prisons was deteriorating. App. 489. The Special Master ascribed this change to increased overcrowding. The rise in population had led to greater demand for care, and existing programming space and staffing levels were inadequate to keep pace. Prisons had retained more mental health staff, but the “growth of the resource [had] not matched the rise in demand.” Id., at 482. At the very time the need for space was rising, the need to house the expanding population had also caused a “reduction of programming space now occupied by inmate bunks.” Id., at 479. The State was “facing a four to five-year gap in the availability of sufficient beds to meet the treatment needs of many inmates/patients.” Id., at 481. “[increasing numbers of truly psychotic inmate/patients are trapped in [lower levels of treatment] that cannot meet their needs.” Ibid. The Special Master concluded that many early “achievements have succumbed to the inexorably rising tide of population, leaving behind growing frustration and despair.” Id., at 489.
C
The second action, Plata v. Brown, involves the class of state prisoners with serious medical conditions. After this action commenced in 2001, the State conceded that deficiencies in prison medical care violated prisoners’ Eighth Amendment rights. The State stipulated to a remedial injunction. The State failed to comply with that injunction, and in 2005 the court appointed a Receiver to oversee remedial efforts. The court found that “the California prison medical care system is broken beyond repair,” resulting in an “unconscionable degree of suffering and death.” App. 917. The court found: “[I]t is an uneontested fact that, on average, an inmate in one of California’s prisons needlessly dies every six to seven days due to constitutional deficiencies in the *508 [California prisons’] medical delivery system.” Ibid. And the court made findings regarding specific instances of neglect, including the following:
“[A] San Quentin prisoner with hypertension, diabetes and renal failure was prescribed two different medications that actually served to exacerbate his renal failure. An optometrist noted the patient’s retinal bleeding due to very high blood pressure and referred him for immediate evaluation, but this evaluation never took place. It was not until a year later that the patient’s renal failure was recognized, at which point he was referred to a nephrologist on an urgent basis; he should have been seen by the specialist within 14 days but the consultation never happened and the patient died three months later,” Id., at 928 (citations omitted).
Prisons were unable to retain sufficient numbers of competent medical staff, id., at 937, and would “hire any doctor who had ‘a license, a pulse and a pair of shoes,' ” id., at 926. Medical facilities lacked “necessary medical equipment” and did “not meet basic sanitation standards.” Id., at 944. “Exam tables and counter tops, where prisoners with . . . communicable diseases are treated, [were] not routinely disinfected.” Ibid.
In 2008, three years after the District Court’s decision, the Receiver described continuing deficiencies in the health care provided by California prisons:
“Timely access is not assured. The number of medical personnel has been inadequate, and competence has not been assured.... Adequate housing for the disabled and aged does not exist. The medical facilities, when they exist at all, are in an abysmal state of disrepair. Basic medical equipment is often not available or used. Medications and other treatment options are too often not available when needed. . . . Indeed, it is a misnomer to call the existing chaos a ‘medical delivery system' — it is *509 more an act of desperation than a system.” Record in No. 3:01-cv-01351-TEH (ND Cal.), Doc. 1136, p. 9.
A report by the Receiver detailed the impact of overcrowding on efforts to remedy the violation. The Receiver explained that “overcrowding, combined with staffing shortages, has created a culture of cynicism, fear, and despair which makes hiring and retaining competent clinicians extremely difficult.” App. 1031. “[0]vercrowding, and the resulting day to day operational chaos of the [prison system], creates regular 'crisis’ situations which . . . take time [and] energy . . . away from important remedial programs.” Id., at 1035. Overcrowding had increased the incidence of infectious disease, id., at 1037-1038, and had led to rising prison violence and greater reliance by custodial staff on lockdowns, which “inhibit the delivery of medical care and increase the staffing necessary for such care,” id., at 1037. “Every day,” the Receiver reported, “California prison wardens and health care managers make the difficult decision as to which of the class actions, Coleman ... or Plata they will fail to comply with because of staff shortages and patient loads.” Id., at 1038.
D
The Coleman and Plata plaintiffs, believing that a remedy for unconstitutional medical and mental health care could not be achieved without reducing overcrowding, moved their respective District Courts to convene a three-judge court empowered under the PLRA to order reductions in the prison population. The judges in both actions granted the request, and the cases were consolidated before a single three-judge court. The State has not challenged the validity of the consolidation in proceedings before this Court, so its propriety is not presented by this appeal.
The three-judge court heard 14 days of testimony and issued a 184-page opinion, making extensive findings of fact. The court ordered California to reduce its prison population *510 to 137.5% of the prisons’ design capacity within two years. Assuming the State does not increase capacity through new construction, the order requires a population reduction of 38,000 to 46,000 persons. Because it appears all but certain that the State cannot complete sufficient construction to comply fully with the order, the prison population will have to be reduced to at least some extent. The court did not order the State to achieve this reduction in any particular manner. Instead, the court ordered the State to formulate a plan for compliance and submit its plan for approval by the court.
The State appealed to this Court pursuant to 28 U. S. C. § 1253, and the Court postponed consideration of the question of jurisdiction to the hearing on the merits. Schwarzenegger v. Plata, 560 U. S. 964 (2010).
II
As a consequence of their own actions, prisoners may be deprived of rights that are fundamental to liberty. Yet the law and the Constitution demand recognition of certain other rights. Prisoners retain the essence of human dignity inherent in all persons. Respect for that dignity animates the Eighth Amendment prohibition against cruel and unusual punishment. “‘The basic concept underlying the Eighth Amendment is nothing less than the dignity of man.’” Atkins v. Virginia, 536 U. S. 304, 311 (2002) (quoting Prop v. Dulles, 356 U. S. 86, 100 (1958) (plurality opinion)).
To incarcerate, society takes from prisoners the means to provide for their own needs. Prisoners are dependent on the State for food, clothing, and necessary medical care. A prison’s failure to provide sustenance for inmates “may actually produce physical ‘torture or a lingering death.’” Estelle v. Gamble, 429 U. S. 97, 103 (1976) (quoting In re Kemmler, 136 U. S. 436, 447 (1890)); see generally A. Eisner, Gates of Injustice: The Crisis in America’s Prisons (2004), Just as a prisoner may starve if not fed, he or she may suffer or die if *511 not provided adequate medical care. A prison that deprives prisoners of basic sustenance, including adequate medical care, is incompatible with the concept of human dignity and has no place in civilized society.
If government fails to fulfill this obligation, the courts have a responsibility to remedy the resulting Eighth Amendment violation. See Hutto v. Finney, 437 U. S. 678, 687, n. 9 (1978). Courts must be sensitive to the State’s interest in punishment, deterrence, and rehabilitation, as well as the need for deference to experienced and expert prison administrators faced with the difficult and dangerous task of housing large numbers of convicted criminals. See Bell v. Wolfish, 441 U. S. 520, 547-548 (1979). Courts nevertheless must not shrink from their obligation to “enforce the constitutional rights of all ‘persons/ including prisoners.” Cruz v. Beto, 405 U. S. 319, 321 (1972) (per curiam). Courts may not allow constitutional violations to continue simply because a remedy would involve intrusion into the realm of prison administration.
Courts faced with the sensitive task of remedying unconstitutional prison conditions must consider a range of available options, including appointment of special masters or receivers and the possibility of consent decrees. When necessary to ensure compliance with a constitutional mandate, courts may enter orders placing limits on a prison’s population. By its terms, the PLEA restricts the circumstances in which a court may enter an order “that has the purpose or effect of reducing or limiting the prison population.” 18 U. S. C. § 3626(g)(4). The order in this case does not necessarily require the State to release any prisoners. The State may comply by raising the design capacity of its prisons or by transferring prisoners to county facilities or facilities in other States. Because the order limits the prison population as a percentage of design capacity, it nonetheless has the “effect of reducing or limiting the prison population.” Ibid.
*512 Under the PLRA, only a three-judge court may enter an order limiting a prison population. § 3626(a)(3)(B). Before a three-judge court may he convened, a district court first must have entered an order for less intrusive relief that failed to remedy the constitutional violation and must have given the defendant a reasonable time to comply with its prior orders. § 3626(a)(3)(A). The party requesting a three-judge court must then submit “materials sufficient to demonstrate that [these requirements] have been met.” § 3626(a)(3)(C). If the district court concludes that the materials are, in fact, sufficient, a three-judge court may be convened. Ibid.; see also 28 U. S. C. § 2284(b)(1) (stating that a three-judge court may not be convened if the district court “determines that three judges are not required”); 17A C. Wright, A. Miller, E. Cooper, & V. Amar, Federal Practice and Procedure § 4235 (3d ed. 2007).
The three-judge court must then find by clear and convincing evidence that “crowding is the primary cause of the violation of a Federal right” and that “no other relief will remedy the violation of the Federal right.” 18 U. S. C. § 3626(a)(3)(E). As with any award of prospective relief under the PLRA, the relief “shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs.” §3626(a)(1)(A). The three-judge court must therefore find that the relief is “narrowly drawn, extends no further than necessary . . ., and is the least intrusive means necessary to correct the violation of the Federal right.” Ibid. In making this determination, the three-judge court must give “substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief.” Ibid. Applying these standards, the three-judge court found a population limit appropriate, necessary, and authorized in this case.
This Court’s review of the three-judge court’s legal determinations is de novo, but factual findings are reviewed for clear error. See Anderson v. Bessemer City, 470 U. S. 564, *513 573-574 (1985). Deference to trial court factfinding reflects an understanding that “[t]he trial judge’s major role is the determination of fact, and with experience in fulfilling that role comes expertise.” Id., at 574. The three-judge court oversaw two weeks of trial and heard at considerable length from California prison officials, as well as experts in the field of correctional administration. The judges had the opportunity to ask relevant questions of those witnesses. Two of the judges had overseen the ongoing remedial efforts of the Receiver and Special Master. The three-judge court was well situated to make the difficult factual judgments necessary to fashion a remedy for this complex and intractable constitutional violation. The three-judge court’s findings of fact may be reversed only if this Court is left with a “ ‘definite and firm conviction that a mistake has been committed.’ ” Id., at 573 (quoting United States v. United States Gypsum Co., 333 U. S. 364, 395 (1948)).
A
The State contends that it was error to convene the three-judge court without affording it more time to comply with the prior orders in Coleman and Plata.
1
The parties dispute this Court’s jurisdiction to review the determinations of the Coleman and Plata District Courts that a three-judge court should be convened. Plaintiffs claim the State was required to raise this issue first in the Court of Appeals by appealing the orders of the District Courts. When exercising jurisdiction under 28 U. S. C. §1253, however, this Court ‘‘has not hesitated to exercise jurisdiction ‘to determine the authority of the court below,’” including whether the three-judge court was properly constituted. Gonzalez v. Automatic Employees Credit Union, 419 U. S. 90, 95, n. 12 (1974) (quoting Bailey v. Patterson, 369 U. S. 31, 34 (1962) (per curiam)); see also Gully v. Interstate *514 Natural Gas Co., 292 U. S. 16, 18 (1934) (per curiam) (“The case is analogous to those in which this Court, finding that the court below has acted without jurisdiction, exercises its appellate jurisdiction to correct the improper action”). The merits of the decision to convene the three-judge court, therefore, are properly before this Court.
2
Before a three-judge court may be convened to consider whether to enter a population limit, the PLRA requires that the court have “previously entered an order for less intrusive relief that has failed to remedy the deprivation of the Federal right sought to be remedied.” 18 U. S. C. § 3626(a)(3)(A)(i). This provision refers to “an order.” It is satisfied if the court has entered one order, and this single order has “failed to remedy” the constitutional violation. The defendant must also have had “a reasonable amount of time to comply with the previous court orders.” § 3626(a)(3)(A)(ii). This provision refers to the court’s “orders.” It requires that the defendant have been given a reasonable time to comply with all of the court’s orders. Together, these requirements ensure that the “ ‘last resort remedy’” of a population limit is not imposed “‘as a first step.’” Inmates of Occoquan v. Barry, 844 F. 2d 828, 843 (CADC 1988).
The first of these conditions, the previous order requirement of § 3626(a)(3)(A)(i), was satisfied in Coleman by appointment of a Special Master in 1995, and it was satisfied in Plata by approval of a consent decree and stipulated injunction in 2002. Both orders were intended to remedy the constitutional violations. Both were given ample time to succeed. When the three-judge court was convened, 12 years had passed since the appointment of the Coleman Special Master, and 5 years had passed since the approval of the Plata consent decree. The State does not claim that either *515 order achieved a remedy. Although the PLRA entitles a State to terminate remedial orders such as these after two years unless the district court finds that the relief “remains necessary to correct a current and ongoing violation of the Federal right,” § 3626(b)(3), California has not attempted to obtain relief on this basis.
The State claims instead that the second condition, the reasonable time requirement of § 3626(a)(3)(A)(ii), was not met because other, later remedial efforts should have been given more time to succeed. In 2006, the Coleman District Judge approved a revised plan of action calling for construction of new facilities, hiring of new staff, and implementation of new procedures. That same year, the Plata District Judge selected and appointed a Receiver to oversee the State’s ongoing remedial efforts. When the three-judge court was convened, the Receiver had filed a preliminary plan of action calling for new construction, hiring of additional staff, and other procedural reforms.
Although both the revised plan of action in Coleman and the appointment of the Receiver in Plata were new developments in the courts’ remedial efforts, the basic plan to solve the crisis through construction, hiring, and procedural reforms remained unchanged. These efforts had been ongoing for years; the failed consent decree in Plata had called for implementation of new procedures and hiring of additional staff; and the Coleman Special Master had issued over 70 orders directed at achieving a remedy through construction, hiring, and procedural reforms. The Coleman Special Master and Plata Receiver were unable to provide assurance that further, substantially similar efforts would yield success absent a population reduction. Instead, the Coleman Special Master explained that “many of the clinical advances ... painfully accomplished over the past decade are slip-sliding away” as a result of overcrowding. App. 481-482. And the Plata Receiver indicated that, absent a reduction in over *516 crowding, a successful remedial effort could “all but bankrupt” the State of California. App. 1053.
Having engaged in remedial efforts for 5 years in Plata and 12 in Coleman, the District Courts were not required to wait to see whether their more recent efforts would yield equal disappointment. When a court attempts to remedy an entrenched constitutional violation through reform of a complex institution, such as this statewide prison system, it may be necessary in the ordinary course to issue multiple orders directing and adjusting ongoing remedial efforts. Each new order must be given a reasonable time to succeed, but reasonableness must be assessed in light of the entire history of the court’s remedial efforts. A contrary reading of the reasonable time requirement would in effect require district courts to impose a moratorium on new remedial orders before issuing a population limit. This unnecessary period of inaction would delay an eventual remedy and would prolong the courts’ involvement, serving neither the State nor the prisoners. Congress did not require this unreasonable result when it used the term “reasonable."
The Coleman and Plata courts had a solid basis to doubt that additional efforts to build new facilities and hire new staff would achieve a remedy. Indeed, although five years have now passed since the appointment of the Plata Receiver and approval of the revised plan of action in Coleman, there is no indication that the constitutional violations have been cured. A report filed by the Coleman Special Master in July 2009 describes ongoing violations, including an “absence of timely access to appropriate levels of care at every point in the system.” App. 807. A report filed by the Plata Receiver in October 2010 likewise describes ongoing deficiencies in the provision of medical care and concludes that there are simply “too many prisoners for the healthcare infrastructure.” App. 1655. The Coleman and Plata courts acted reasonably when they convened a three-judge court without further delay.
*517 B
Once a three-judge court has been convened, the court must find additional requirements satisfied before it may impose a population limit. The first of these requirements is that “crowding is the primary cause of the violation of a Federal right.” 18 U. S. C. §3626(a)(3)(E)(i).
1
The three-judge court found the primary cause requirement satisfied by the evidence at trial. The court found that overcrowding strains inadequate medical and mental health facilities; overburdens limited clinical and custodial staff; and creates violent, unsanitary, and chaotic conditions that contribute to the constitutional violations and frustrate efforts to fashion a remedy. The three-judge court also found that “until the problem of overcrowding is overcome it will be impossible to provide constitutionally compliant care to California’s prison population.” Juris. App. 141a.
The parties dispute the standard of review applicable to this determination. With respect to the three-judge court’s factual findings, this Court’s review is necessarily deferential. It is not this Court’s place to “duplicate the role” of the trial court. Anderson, 470 U. S., at 573. The ultimate issue of primary cause presents a mixed question of law and fact; but there, too, “the mix weighs heavily on the 'fact’ side.” Lilly v. Virginia, 527 U. S. 116, 148 (1999) (Rehnquist, C. J., concurring in judgment). Because the “district court is 'better positioned’... to decide the issue,” our review of the three-judge court’s primary cause determination is deferential. Salve Regina College v. Russell, 499 U. S. 225, 233 (1991).
The record documents the severe impact of burgeoning demand on the provision of care. At the time of trial, vacancy rates for medical and mental health staff ranged as high as 20% for surgeons, 25% for physicians, 39% for nurse prac *518 titioners, and 54.1% for psychiatrists. Juris. App. 105a, 108a. These percentages are based on the number of positions budgeted by the State. Dr. Ronald Shansky, former medical director of the Illinois prison system, concluded that these numbers understate the severity of the crisis because the State has not budgeted sufficient staff to meet demand.[5] According to Dr. Shansky, “even if the prisons were able to fill all of their vacant health care positions, which they have not been able to do to date, . . . the prisons would still be unable to handle the level of need given the current overcrowding.” Record in No. 2:90-cv-00520-LKK-JFM (ED Cal.), Doc. 3231-13, p. 19 (hereinafter Doc. 3231-13). Dr. Craig Haney, a professor of psychology, reported that mental health staff are “managing far larger caseloads than is appropriate or effective.” App. 596. A prison psychiatrist told Dr. Haney that “ ‘we are doing about 50% of what we should be doing.’ ” Ibid. In the context of physical care Dr. Shansky agreed that “demand for care, particularly for the high priority cases, continues to overwhelm the resources available.” Id., at 1408.
Even on the assumption that vacant positions could be filled, the evidence suggested there would be insufficient space for the necessary additional staff to perform their jobs. The Plata Receiver, in his report on overcrowding, concluded that even the “newest and most modern prisons” had been “designed with clinic space which is only one-half that necessary for the real-life capacity of the prisons.” App. 1023 (emphasis deleted). Dr. Haney reported that “[ejach one of the facilities I toured was short of significant amounts of space needed to perform otherwise critical tasks and re *519 sponsibilities.” Id., at 597-598. In one facility, staff cared for 7,525 prisoners in space designed for one-third as many. Juris. App. 93a. Staff operate out of converted storage rooms, closets, bathrooms, shower rooms, and visiting centers. These makeshift facilities impede the effective delivery of care and place the safety of medical professionals in jeopardy, compounding the difficulty of hiring additional staff.
This shortfall of resources relative to demand contributes to significant delays in treatment. Mentally ill prisoners are housed in administrative segregation while awaiting transfer to scarce mental health treatment beds for appropriate care. One correctional officer indicated that he had kept mentally ill prisoners in segregation for ‘“6 months or more.’” App. 594. Other prisoners awaiting care are held in tiny, phone-booth-sized cages. The record documents instances of prisoners committing suicide while awaiting treatment.[6]
Delays are no less severe in the context of physical care. Prisons have backlogs of up to 700 prisoners waiting to see a doctor. Doc. 3231-13, at 21. A review of referrals for urgent specialty care at one prison revealed that only 105 of 316 pending referrals had a scheduled appointment, and only 2 had an appointment scheduled to occur within 14 days. Id., at 25-26. Urgent specialty referrals at one prison had been pending for six months to a year. Id., at 30.
Crowding also creates unsafe and unsanitary living conditions that hamper effective delivery of medical and mental health care. A medical expert described living quarters in converted gymnasiums or dayrooms, where large numbers of prisoners may share just a few toilets and showers, as *520 “‘breeding grounds for disease.’”[7] Juris. App. 102a. Cramped conditions promote unrest and violence, making it difficult for prison officials to monitor and control the prison population. On any given day, prisoners in the general prison population may become ill, thus entering the plaintiff class; and overcrowding may prevent immediate medical attention necessary to avoid suffering, death, or spread of disease. After one prisoner was assaulted in a crowded gymnasium, prison staff did not even learn of the injury until the prisoner had been dead for several hours. Tr. 382. Living in crowded, unsafe, and unsanitary conditions can cause prisoners with latent mental illnesses to worsen and develop overt symptoms. Crowding may also impede efforts to improve delivery of care. Two prisoners committed suicide by hanging after being placed in cells that had been identified as requiring a simple fix to remove attachment points that could support a noose. The repair was not made because doing so would involve removing prisoners from the cells, and there was no place to put them. Id., at 769-777. More generally, Jeanne Woodford, the former acting secretary of California’s prisons, testified that there “‘are simply too many issues that arise from such a large number of prisoners,’” and that, as a result, “‘management spends virtually all of its time fighting fires instead of engaging in thoughtful decision-making and planning’” of the sort needed to fashion an effective remedy for these constitutional violations. Juris. App. 82a.
*521 Increased violence also requires increased reliance on lock-downs to keep order, and lockdowns further impede the effective delivery of care. In 2006, prison officials instituted 449 lockdowns. Id., at 116a. The average lockdown lasted 12 days, and 20 lockdowns lasted 60 days or longer. Ibid. During lockdowns, staff must either escort prisoners to medical facilities or bring medical staff to the prisoners. Either procedure puts additional strain on already overburdened medical and custodial staff. Some programming for the mentally ill even may be canceled altogether during lock-downs, and staff may be unable to supervise the delivery of psychotropic medications.
The effects of overcrowding are particularly acute in the prisons’ reception centers, intake areas that process 140,000 new or returning prisoners every year. Id., at 85a. Crowding in these areas runs as high as 300% of design capacity. Id., at 86a. Living conditions are “‘toxic,’” and a lack of treatment space impedes efforts to identify inmate medical or mental health needs and provide even rudimentary care. Id., at 92a. The former warden of San Quentin reported that doctors in that prison’s reception center “ ‘were unable to keep up with physicals or provid[e] any kind of chronic care follow-up.’ ” Id., at 90a. Inmates spend long periods of time in these areas awaiting transfer to the general population. Some prisoners are held in the reception centers for their entire period of incarceration.
Numerous experts testified that crowding is the primary cause of the constitutional violations. The former warden of San Quentin and former acting secretary of the California prisons concluded that crowding “makes it ‘virtually impossible for the organization to develop, much less implement, a plan to provide prisoners with adequate care.’ ” Id., at 83a. The former executive director of the Texas Department of Criminal Justice testified that “‘[e] very thing revolves around overcrowding’ ” and that “ ‘overcrowding is the primary cause of the medical and mental health care viola *522 tions.’” Id., at 127a. The former head of corrections in Pennsylvania, Washington, and Maine testified that overcrowding is “ 'overwhelming the system both in terms of sheer numbers, in terms of the space available, in terms of providing healthcare.'” Ibid. And the current secretary of the Pennsylvania Department of Corrections testified that “ “the biggest inhibiting factor right now in California being able to deliver appropriate mental health and medical care is the severe overcrowding.'” Id., at 82a.
2
The State attempts to undermine the substantial evidence presented at trial, and the three-judge court's findings of fact, by complaining that the three-judge court did not allow it to present evidence of current prison conditions. This suggestion lacks a factual basis.
The three-judge court properly admitted evidence of current conditions as relevant to the issues before it. The three-judge court allowed discovery until a few months before trial; expert witnesses based their conclusions on recent observations of prison conditions; the court admitted recent reports on prison conditions by the Plata Receiver and Coleman Special Master; and both parties presented testimony related to current conditions, including understaffing, inadequate facilities, and unsanitary and unsafe living conditions. See supra, at 504-507, 517-521 and this page. Dr. Craig Haney, for example, based his expert report on tours of eight California prisons. App. 539. These tours occurred as late as August 2008, two weeks before Dr. Haney submitted his report and less than four months before the first day of trial. Id., at 585; see also id., at 563, 565, 580 (July tours). Other experts submitted reports based on similar observations. See, e. g., Doc. 3231-13, at 9 (Dr. Shansky); App. 646 (Dr. Stewart); id., at 1245 (Austin); id., at 1312 (Lehman).
The three-judge court's opinion cited and relied on this evidence of current conditions. The court relied extensively *523 on the expert witness reports. See generally Juris. App. 85a-143a. The court cited the most current data available on suicides and preventable deaths in the California prisons. Id., at 123a, 125a. The court relied on statistics on staff vacancies that dated to three months before trial, id., at 105a, 108a, and statistics on shortages of treatment beds for the same period, id., at 97a. These are just examples of the extensive evidence of current conditions that informed every aspect of the judgment of the three-judge court. The three-judge court did not abuse its discretion when it also cited findings made in earlier decisions of the Plata and Coleman District Courts. Those findings remained relevant to establish the nature of these longstanding, continuing constitutional violations.
It is true that the three-judge court established a cutoff date for discovery a few months before trial. The order stated that site inspections of prisons would be allowed until that date, and that evidence of “changed prison conditions” after that date would not be admitted. App. 1190. The court also excluded evidence not pertinent to the issue whether a population limit is appropriate under the PLRA, including evidence relevant solely to the existence of an ongoing constitutional violation. The court reasoned that its decision was limited to the issue of remedy and that the merits of the constitutional violation had already been determined. The three-judge court made clear that all such evidence would be considered “[t]o the extent that it illuminates questions that are properly before the court.” Id., at 2339.
Both rulings were within the sound discretion of the three-judge court. Orderly trial management may require discovery deadlines and a clean distinction between litigation of the merits and the remedy. The State in fact represented to the three-judge court that it would be “appropriate” to cut off discovery before trial because “like plaintiffs, we, too, are really gearing up and going into a pretrial mode.” Id., at 1683. And if the State truly believed there was no longer *524 a violation, it could have argued to the Coleman and Plata District Courts that a three-judge court should not be convened because the District Courts’ prior orders had not "failed to remedy the deprivation” of prisoners’ constitutional rights. 18 U. S. C. § 3626(a)(3)(A)(i); see also supra, at 514-515. Once the three-judge court was convened, that court was not required to reconsider the merits. Its role was solely to consider the propriety and necessity of a population limit.
The State does not point to any significant evidence that it was unable to present and that would have changed the outcome of the proceedings. To the contrary, the record and opinion make clear that the decision of the three-judge court was based on current evidence pertaining to ongoing constitutional violations.
3
The three-judge court acknowledged that the violations were caused by factors in addition to overcrowding and that reducing crowding in the prisons would not entirely cure the violations. This is consistent with the reports of the Coleman Special Master and Plata Receiver, both of whom concluded that even a significant reduction in the prison population would not remedy the violations absent continued efforts to train staff, improve facilities, and reform procedures. App. 487, 1054.[8] The three-judge court nevertheless found *525 that overcrowding was the primary cause in the sense of being the foremost cause of the violation.
This understanding of the primary cause requirement is consistent with the text of the PLRA. The State in fact concedes that it proposed this very definition of primary cause to the three-judge court. “Primary” is defined as “[f]irst or highest in rank, quality, or importance; principal.” American Heritage Dictionary 1393 (4th ed. 2000); see also Webster’s Third New International Dictionary 1800 (2002) (defining “primary” as “first in rank or importance”); 12 Oxford English Dictionary 472 (2d ed. 1989) (defining “primary” as “[o]f the first or highest rank or importance; that claims the first consideration; principal, chief”). Overcrowding need only be the foremost, chief, or principal cause of the violation. If Congress had intended to require that crowding be the only cause, it would have said so, assuming in its judgment that definition would be consistent with constitutional limitations.
As this case illustrates, constitutional violations in conditions of confinement are rarely susceptible of simple or straightforward solutions. In addition to overcrowding the failure of California’s prisons to provide adequate medical and mental health care may be ascribed to chronic and worsening budget shortfalls, a lack of political will in favor of reform, inadequate facilities, and systemic administrative failures. The Plata District Judge, in his order appointing the Receiver, compared the problem to “‘a spider web, in which the tension of the various strands is determined by the relationship among all the parts of the web, so that if one pulls on a single strand, the tension of the entire web is redistributed in a new and complex pattern.’” App. 966-967 (quoting Fletcher, The Discretionary Constitution: Institutional Remedies and Judicial Legitimacy, 91 Yale L. J. 635, 645 (1982)); see also Hutto, 437 U. S., at 688 (noting “the interdependence of the conditions producing the violation,” in- *526 eluding overcrowding). Only a multifaceted approach aimed at many causes, including overcrowding, will yield a solution.
The PLRA should not be interpreted to place undue restrictions on the authority of federal courts to fashion practical remedies when confronted with complex and intractable constitutional violations. Congress limited the availability of limits on prison populations, but it did not forbid these measures altogether. See 18 U. S. C. § 3626. The House Report accompanying the PLRA explained:
“While prison caps must be the remedy of last resort, a court still retains the power to order this remedy despite its intrusive nature and harmful consequences to the public if, but only if, it is truly necessary to prevent an actual violation of a prisoner’s federal rights.” H. R. Rep. No. 104-21, p. 25 (1995).
Courts should presume that Congress was sensitive to the real-world problems faced by those who would remedy constitutional violations in the prisons and that Congress did not leave prisoners without a remedy for violations of their constitutional rights. A reading of the PLRA that would render population limits unavailable in practice would raise serious constitutional concerns. See, e. g., Bowen v. Michigan Academy of Family Physicians, 476 U. S. 667, 681, n. 12 (1986). A finding that overcrowding is the “primary cause” of a violation is therefore permissible, despite the fact that additional steps will be required to remedy the violation.
C
The three-judge court was also required to find by clear and convincing evidence that “no other relief will remedy the violation of the Federal right.” § 3626(a)(3)(E)(ii).
The State argues that the violation could have been remedied through a combination of new construction, transfers of prisoners out of State, hiring of medical personnel, and continued efforts by the Plata Receiver and Coleman Spe *527 cial Master. The order in fact permits the State to comply with the population limit by transferring prisoners to county facilities or facilities in other States, or by constructing new facilities to raise the prisons’ design capacity. And the three-judge court’s order does not bar the State from undertaking any other remedial efforts. If the State does find an adequate remedy other than a population limit, it may seek modification or termination of the three-judge court’s order on that basis. The evidence at trial, however, supports the three-judge court’s conclusion that an order limited to other remedies would not provide effective relief.
The State’s argument that out-of-state transfers provide a less restrictive alternative to a population limit must fail because requiring out-of-state transfers itself qualifies as a population limit under the PLRA.[9] Such an order “has the purpose or effect of reducing or limiting the prison population, or . . . directs the release from or nonadmission of prisoners to a prison.” § 3626(g)(4). The same is true of transfers to county facilities. Transfers provide a means to reduce the prison population in compliance with the three-judge court’s order. They are not a less restrictive alternative to that order.
Even if out-of-state transfers could be regarded as a less restrictive alternative, the three-judge court found no evidence of plans for transfers in numbers sufficient to relieve overcrowding. The State complains that the Coleman District Court slowed the rate of transfer by requiring inspections to ensure that the receiving institutions were in compliance with the Eighth Amendment, but the State has made no effort to show that it has the resources and the capacity *528 to transfer significantly larger numbers of prisoners absent that condition.
Construction of new facilities, in theory, could alleviate overcrowding, but the three-judge court found no realistic possibility that California would be able to build itself out of this crisis. At the time of the court’s decision the State had plans to build new medical and housing facilities, but funding for some plans had not been secured and funding for other plans had been delayed by the legislature for years. Particularly in light of California’s ongoing fiscal crisis, the three-judge court deemed “chimerical” any “remedy that requires significant additional spending by the state.” Juris. App. 151a. Events subsequent to the three-judge court’s decision have confirmed this conclusion. In October 2010, the State notified the Coleman District Court that a substantial component of its construction plans had been delayed indefinitely by the legislature. And even if planned construction were to be completed, the Plata Receiver found that many so-called “expansion” plans called for cramming more prisoners into existing prisons without expanding administrative and support facilities. Juris. App. 151a-152a. The former acting secretary of the California prisons explained that these plans would “‘compound the burdens imposed on prison administrators and line staff'” by adding to the already overwhelming prison population, creating new barriers to achievement of a remedy. Id., at 152a.
The three-judge court also rejected additional hiring as a realistic means to achieve a remedy. The State for years had been unable to fill positions necessary for the adequate provision of medical and mental health care, and the three-judge court found no reason to expect a change. Although the State points to limited gains in staffing between 2007 and 2008, the record shows that the prison system remained chronically understaffed through trial in 2008. See supra, at 517-518. The three-judge court found that violence and other negative conditions caused by crowding made it diffi *529 cult to hire and retain needed staff The court also concluded that there would be insufficient space for additional staff to work even if adequate personnel could somehow be retained. Additional staff cannot help to remedy the violation if they have no space in which to see and treat patients.
The three-judge court also did not err, much less commit clear error, when it concluded that, absent a population reduction, continued efforts by the Receiver and Special Master would not achieve a remedy. Both the Receiver and the Special Master filed reports stating that overcrowding posed a significant barrier to their efforts. The Plata Receiver stated that he was determined to achieve a remedy even without a population reduction, but he warned that such an effort would “all but bankrupt” the State. App. 1053. The Coleman Special Master noted even more serious concerns, stating that previous remedial efforts had “succumbed to the inexorably rising tide of population.” App. 489. Both reports are persuasive evidence that, absent a reduction in overcrowding, any remedy might prove unattainable and would at the very least require vast expenditures of resources by the State. Nothing in the long history of the Coleman and Plata actions demonstrates any real possibility that the necessary resources would be made available.
The State claims that, even if each of these measures were unlikely to remedy the violation, they would succeed in doing so if combined together. Aside from asserting this proposition, the State offers no reason to believe it is so. Attempts to remedy the violations in Plata have been ongoing for nine years. In Coleman, remedial efforts have been ongoing for 16. At one time, it may have been possible to hope that these violations would be cured without a reduction in overcrowding. A long history of failed remedial orders, together with substantial evidence of overcrowding’s deleterious effects on the provision of care, compels a different conclusion today.
*530 The common thread connecting the State’s proposed remedial efforts is that they would require the State to expend large amounts of money absent a reduction in overcrowding. The Court cannot ignore the political and fiscal reality behind this case. California’s Legislature has not been willing or able to allocate the resources necessary to meet this crisis absent a reduction in overcrowding. There is no reason to believe it will begin to do so now, when the State of California is facing an unprecedented budgetary shortfall. As noted above, the legislature recently failed to allocate funds for planned new construction. Supra, at 528. Without a reduction in overcrowding, there will be no efficacious remedy for the unconstitutional care of the sick and mentally ill in California’s prisons.
D
The PLRA states that no prospective relief shall issue with respect to prison conditions unless it is narrowly drawn, extends no further than necessary to correct the violation of a federal right, and is the least intrusive means necessary to correct the violation. 18 U. S. C. § 3626(a). When determining whether these requirements are met, courts must “give substantial weight to any adverse impact on public safety or the operation of a criminal justice system.” Ibid.
1
The three-judge court acknowledged that its order “is likely to affect inmates without medical conditions or serious mental illness." Juris. App. 172a. This is because reducing California’s prison population will require reducing the number of prisoners outside the class through steps such as parole reform, sentencing reform, use of good-time credits, or other means to be determined by the State. Reducing overcrowding will also have positive effects beyond facilitating timely and adequate access to medical care, including reducing the incidence of prison violence and ameliorating unsafe living conditions. According to the State, these collateral *531 consequences are evidence that the order sweeps more broadly than necessary.
The population limit imposed by the three-judge court does not fail narrow tailoring simply because it will have positive effects beyond the plaintiff class. Narrow tailoring requires a “ ‘ “fit” between the [remedy’s] ends and the means chosen to accomplish those ends.’” Board of Trustees of State Univ. of N. Y. v. Fox, 492 U. S. 469, 480 (1989). The scope of the remedy must be proportional to the scope of the violation, and the order must extend no further than necessary to remedy the violation. This Court has rejected remedial orders that unnecessarily reach out to improve prison conditions other than those that violate the Constitution. Lewis v. Casey, 518 U. S. 343, 357 (1996). But the precedents do not suggest that a narrow and otherwise proper remedy for a constitutional violation is invalid simply because it will have collateral effects.
Nor does anything in the text of the PLRA require that result. The PLRA states that a remedy shall extend no further than necessary to remedy the violation of the rights of a “particular plaintiff or plaintiffs.” 18 U. S. C. § 3626(a)(1)(A). This means only that the scope of the order must be determined with reference to the constitutional violations established by the specific plaintiffs before the court.
This case is unlike cases where courts have impermissibly reached out to control the treatment of persons or institutions beyond the scope of the violation. See Dayton Bd. of Ed. v. Brinkman, 433 U. S. 406, 420 (1977). Even prisoners with no present physical or mental illness may become afflicted, and all prisoners in California are at risk so long as the State continues to provide inadequate care. Prisoners in the general population will become sick, and will become members of the plaintiff classes, with routine frequency; and overcrowding may prevent the timely diagnosis and care necessary to provide effective treatment and to prevent fur *532 ther spread of disease. Relief targeted only at present members of the plaintiff classes may therefore fail to adequately protect future class members who will develop serious physical or mental illness. Prisoners who are not sick or mentally ill do not yet have a claim that they have been subjected to care that violates the Eighth Amendment, but in no sense are they remote bystanders in California’s medical care system. They are that system’s next potential victims.
A release order limited to prisoners within the plaintiff classes would, if anything, unduly limit the ability of state officials to determine which prisoners should be released. As the State acknowledges in its brief, “release of seriously mentally ill inmates [would be] likely to create special dangers because of their recidivism rates." Consolidated Reply Brief for Appellants 34. The order of the three-judge court gives the State substantial flexibility to determine who should be released. If the State truly believes that a release order limited to sick and mentally ill inmates would be preferable to the order entered by the three-judge court, the State can move the three-judge court for modification of the order on that basis. The State has not requested this relief from this Court.
The order also is not overbroad because it encompasses the entire prison system, rather than separately assessing the need for a population limit at every institution. The Coleman court found a systemwide violation when it first afforded relief, and in Plata the State stipulated to system-wide relief when it conceded the existence of a violation. Both the Coleman Special Master and the Plata Receiver have filed numerous reports detailing systemwide deficiencies in medical and mental health care. California’s medical care program is run at a systemwide level, and resources are shared among the correctional facilities.
Although the three-judge court’s order addresses the entire California prison system, it affords the State flexibility *533 to accommodate differences between institutions. There is no requirement that every facility comply with the 137.5% limit. Assuming no constitutional violation results, some facilities may retain populations in excess of the limit provided other facilities fall sufficiently below it so the system as a whole remains in compliance with the order. This will allow prison officials to shift prisoners to facilities that are better able to accommodate overcrowding, or out of facilities where retaining sufficient medical staff has been difficult. The alternative — a series of institution-specific population limits — would require federal judges to make these choices. Leaving this discretion to state officials does not make the order overbroad.
Nor is the order overbroad because it limits the State’s authority to run its prisons, as the State urges in its brief. While the order does in some respects shape or control the State’s authority in the realm of prison administration, it does so in a manner that leaves much to the State’s discretion. The State may choose how to allocate prisoners between institutions; it may choose whether to increase the prisons’ capacity through construction or reduce the population; and, if it does reduce the population, it may decide what steps to take to achieve the necessary reduction. The order’s limited scope is necessary to remedy a constitutional violation.
As the State implements the order of the three-judge court, time and experience may reveal targeted and effective remedies that will end the constitutional violations even without a significant decrease in the general prison population. The State will be free to move the three-judge court for modification of its order on that basis, and these motions would be entitled to serious consideration. See infra, at 543-545. At this time, the State has not proposed any realistic alternative to the order. The State’s desire to avoid a population limit, justified as according respect to state authority, creates a certain and unacceptable risk of continuing *534 violations of the rights of sick and mentally ill prisoners, with the result that many more will die or needlessly suffer. The Constitution does not permit this wrong.
2
In reaching its decision, the three-judge court gave “substantial weight” to any potential adverse impact on public safety from its order. The court devoted nearly 10 days of trial to the issue of public safety, and it gave the question extensive attention in its opinion. Ultimately, the court concluded that it would be possible to reduce the prison population “in a manner that preserves public safety and the operation of the criminal justice system.” Juris. App. 247a-248a.
The PLRA’s requirement that a court give “substantial weight” to public safety does not require the court to certify that its order has no possible adverse impact on the public. A contrary reading would depart from the statute’s text by replacing the word “substantial” with “conclusive.” Whenever a eourt issues an order requiring the State to adjust its incarceration and criminal justice policy, there is a risk that the order will have some adverse impact on public safety in some sectors. This is particularly true when the order requires release of prisoners before their sentence has been served. Persons incarcerated for even one offense may have committed many other crimes prior to arrest and conviction, and some number can be expected to commit further crimes upon release. Yet the PLRA contemplates that courts will retain authority to issue orders necessary to remedy constitutional violations, including authority to issue population limits when necessary. See supra, at 527. A court is required to consider the public safety consequences of its order and to structure, and monitor, its ruling in a way that mitigates those consequences while still achieving an effective remedy of the constitutional violation.
*535 This inquiry necessarily involves difficult predictive judgments regarding the likely effects of court orders. Although these judgments are normally made by state officials, they necessarily must be made by courts when those courts fashion injunctive relief to remedy serious constitutional violations in the prisons. These questions are difficult and sensitive, but they are factual questions and should be treated as such. Courts can, and should, rely on relevant and informed expert testimony when making factual findings. It was proper for the three-judge court to rely on the testimony of prison officials from California and other States. Those experts testified on the basis of empirical evidence and extensive experience in the field of prison administration.
The three-judge court credited substantial evidence that prison populations can be reduced in a manner that does not increase crime to a significant degree. Some evidence indicated that reducing overcrowding in California’s prisons could even improve public safety. Then-Governor Schwarzenegger, in his emergency proclamation on overcrowding, acknowledged that “‘overcrowding causes harm to people and property, leads to inmate unrest and misconduct, . . . and increases recidivism as shown within this state and in others.’” Juris. App. 191a-192a. The former warden of San Quentin and acting secretary of the California prison system testified that she “‘absolutely believe[s] that we make people worse, and that we are not meeting public safety by the way we treat people.’ ”[10] Id., at 129a. And the head of *536 Pennsylvania’s correctional system testified that measures to reduce prison population may “actually improve on public safety because they address the problems that brought people to jail.” Tr. 1552-1553.
Expert witnesses produced statistical evidence that prison populations had been lowered without adversely affecting public safety in a number of jurisdictions, including certain counties in California, as well as Wisconsin, Illinois, Texas, Colorado, Montana, Michigan, Florida, and Canada. Juris. App. 245a.[11] Washington’s former secretary of corrections testified that his State had implemented population-reduction methods, including parole reform and expansion of good-time credits, without any “deleterious effect on crime.” Tr. 2008-2009. In light of this evidence, the three-judge court concluded that any negative impact on public safety *537 would be “substantially offset, and perhaps entirely eliminated, by the public safety benefits” of a reduction in overcrowding. Juris. App. 248a.
The court found that various available methods of reducing overcrowding would have little or no impact on public safety. Expansion of good-time credits would allow the State to give early release to only those prisoners who pose the least risk of reoffending. Diverting low-risk offenders to community programs such as drug treatment, day reporting centers, and electronic monitoring would likewise lower the prison population without releasing violent convicts.[12] The State now sends large numbers of persons to prison for violating a technical term or condition of their parole, and it could reduce the prison population by punishing technical parole violations through community-based programs. This last measure would be particularly beneficial as it would reduce crowding in the reception centers, which are especially hard hit by overcrowding. See supra, at 521. The court’s order took account of public safety concerns by giving the State substantial flexibility to select among these and other means of reducing overcrowding.
The State submitted a plan to reduce its prison population in accordance with the three-judge court’s order, and it complains that the three-judge court approved that plan without considering whether the specific measures contained within it would substantially threaten public safety. The three-judge court, however, left the choice of how best to comply with its population limit to state prison officials. The court *538 was not required to second-guess the exercise of that discretion. Courts should presume that state officials are in a better position to gauge how best to preserve public safety and balance competing correctional and law enforcement concerns. The decision to leave details of implementation to the State’s discretion protected public safety by leaving sensitive policy decisions to responsible and competent state officials.
During the pendency of this appeal, the State in fact began to implement measures to reduce the prison population. See Supp. Brief for Appellants 1. These measures will shift “thousands” of prisoners from the state prisons to the county jails by “mak[ing] certain felonies punishable by imprisonment in county jail” and “requiring] that individuals returned to custody for violating their conditions of parole ‘serve any custody term in county jail.’” Ibid. These developments support the three-judge court's conclusion that the prison population can be reduced in a manner calculated to avoid an undue negative effect on public safety.
Ill
Establishing the population at which the State could begin to provide constitutionally adequate medical and mental health care, and the appropriate timeframe within which to achieve the necessary reduction, requires a degree of judgment. The inquiry involves uncertain predictions regarding the effects of population reductions, as well as difficult determinations regarding the capacity of prison officials to provide adequate care at various population levels. Courts have substantial flexibility when making these judgments. “ ‘Once invoked, “the scope of a district court’s equitable powers ... is broad, for breadth and flexibility are inherent in equitable remedies.” ’ ” Hutto, 437 U. S., at 687, n. 9 (quoting Milliken v. Bradley, 433 U. S. 267, 281 (1977), in turn quoting Swann v. Charlotte-Mecklenburg Bd. of Ed., 402 U. S. 1, 15 (1971)).
*539 Nevertheless, the PLEA requires a court to adopt a remedy that is “narrowly tailored” to the constitutional violation and that gives “substantial weight” to public safety. 18 U. S. C. § 3626(a). When a court is imposing a population limit, this means the court must set the limit at the highest population consistent with an efficacious remedy. The court must also order the population reduction achieved in the shortest period of time reasonably consistent with public safety.
A
The three-judge court concluded that the population of California’s prisons should be capped at 137.5% of design capacity. This conclusion is supported by the record. Indeed, some evidence supported a limit as low as 100% of design capacity. The chief deputy secretary of Correctional Healthcare Services for the California prisons testified that California’s prisons “ ‘were not designed and made no provision for any expansion of medical care space beyond the initial 100% of capacity.’” Juris. App. 176a. Other evidence supported a limit as low as 130%. The head of the State’s Facilities Strike Team recommended reducing the population to 130% of design capacity as a long-term goal. Id., at 179a-180a. A former head of correctional systems in Washington State, Maine, and Pennsylvania testified that a 130% limit would “ ‘give prison officials and staff the ability to provide the necessary programs and services for California’s prisoners.’” Id., at 180a. A former executive director of the Texas prisons testified that a limit of 130% was “ ‘realistic and appropriate’” and would “‘ensure that [California’s] prisons are safe and provide legally required services.’ ” Ibid. And a former acting secretary of the California prisons agreed with a 130% limit with the caveat that a 130% limit might prove inadequate in some older facilities. Ibid.
According to the State, this testimony expressed the witnesses’ policy preferences, rather than their views as to what would cure the constitutional violation. Of course, courts *540 must not confuse professional standards with constitutional requirements. Rhodes v. Chapman, 452 U. S. 337, 348, n. 13 (1981). But expert opinion may be relevant when determining what is obtainable and what is acceptable in corrections philosophy. See supra, at 536-537. Nothing in the record indicates that the experts in this case imposed their own policy views or lost sight of the underlying violations. To the contrary, the witnesses testified that a 130% population limit would allow the State to remedy the constitutionally inadequate provision of medical and mental health care. When expert opinion is addressed to the question of how to remedy the relevant constitutional violations, as it was here, federal judges can give it considerable weight.
The Federal Bureau of Prisons (BOP) has set 130% as a long-term goal for population levels in the federal prison system. Brief for Appellants 43-44. The State suggests the expert witnesses impermissibly adopted this professional standard in their testimony. But courts are not required to disregard expert opinion solely because it adopts or accords with professional standards. Professional standards may be “helpful and relevant with respect to some questions.” Chapman, supra, at 348, n. 13. The witnesses testified that a limit of 130% was necessary to remedy the constitutional violations, not that it should be adopted because it is a BOP standard. If anything, the fact that the BOP views 130% as a manageable population density bolsters the three-judge court’s conclusion that a population limit of 130% would alleviate the pressures associated with overcrowding and allow the State to begin to provide constitutionally adequate care.
Although the three-judge court concluded that the “evidence in support of a 130% limit is strong,” it found that some upward adjustment was warranted in light of “the caution and restraint required by the PLRA.” Juris. App. 183a, 184a. The three-judge court noted evidence supporting a higher limit. In particular, the State’s Corrections Independent Review Panel had found that 145% was the maxi *541 mum “operable capacity” of California’s prisons, id., at 181a-182a, although the relevance of that determination was undermined by the fact that the panel had not considered the need to provide constitutionally adequate medical and mental health care, as the State itself concedes. Brief for Coleman Appellees 45. After considering, but discounting, this evidence, the three-judge court concluded that the evidence supported a limit lower than 145%, but higher than 130%. It therefore imposed a limit of 137.5%.
This weighing of the evidence was not clearly erroneous. The adversary system afforded the court an opportunity to weigh and evaluate evidence presented by the parties. The plaintiffs’ evidentiary showing was intended to justify a limit of 130%, and the State made no attempt to show that any other number would allow for a remedy. There are also no scientific tools available to determine the precise population reduction necessary to remedy a constitutional violation of this sort. The three-judge court made the most precise determination it could in light of the record before it. The PLRA’s narrow tailoring requirement is satisfied so long as these equitable, remedial judgments are made with the objective of releasing the fewest possible prisoners consistent with an efficacious remedy. In light of substantial evidence supporting an even more drastic remedy, the three-judge court complied with the requirement of the PLRA in this case.
B
The three-judge court ordered the State to achieve this reduction within two years. At trial and closing argument before the three-judge court, the State did not argue that reductions should occur over a longer period of time. The State later submitted a plan for court approval that would achieve the required reduction within five years, and that would reduce the prison population to 151% of design capacity in two years. The State represented that this plan would “safely reach a population level of 137.5% over time.” *542 Juris. App. 317a. The three-judge court rejected this plan because it did not comply with the deadline set by its order.
The State first had notice that it would be required to reduce its prison population in February 2009, when the three-judge court gave notice of its tentative ruling after trial. The 2-year deadline, however, will not begin to run until this Court issues its judgment. When that happens, the State will have already had over two years to begin complying with the order of the three-judge court. The State has used the time productively. At oral argument, the State indicated it had reduced its prison population by approximately 9,000 persons since the decision of the three-judge court. After oral argument, the State filed a supplemental brief indicating that it had begun to implement measures to shift “thousands” of additional prisoners to county facilities. Supp. Brief for Appellants 1.
Particularly in light of the State’s failure to contest the issue at trial, the three-judge court did not err when it established a 2-year deadline for relief. Plaintiffs proposed a 2-year deadline, and the evidence at trial was intended to demonstrate the feasibility of a 2-year deadline. See Tr. 2979. Notably, the State has not asked this Court to extend the 2-year deadline at this time.
The three-judge court, however, retains the authority, and the responsibility, to make further amendments to the existing order or any modified decree it may enter as warranted by the exercise of its sound discretion. “The power of a court of equity to modify a decree of injunctive relief is long-established, broad, and flexible.” New York State Assn. for Retarded Children, Inc. v. Carey, 706 F. 2d 956, 967 (CA2 1983) (Friendly, J.). A court that invokes equity’s power to remedy a constitutional violation by an injunction mandating systemic changes to an institution has the continuing duty and responsibility to assess the efficacy and consequences of its order. Id., at 969-971. Experience may teach the necessity for modification or amendment of an earlier decree. *543 To that end, the three-judge court must remain open to a showing or demonstration by either party that the injunction should be altered to ensure that the rights and interests of the parties are given all due and necessary protection.
Proper respect for the State and for its governmental processes requires that the three-judge court exercise its jurisdiction to accord the State considerable latitude to find mechanisms and make plans to correct the violations in a prompt and effective way consistent with public safety. In order to “give substantial weight to any adverse impact on public safety,” 18 U. S. C. § 3626(a)(1)(A), the three-judge court must give due deference to informed opinions as to what public safety requires, including the considered determinations of state officials regarding the time in which a reduction in the prison population can be achieved consistent with public safety. An extension of time may allow the State to consider changing political, economic, and other circumstances and to take advantage of opportunities for more effective remedies that arise as the Special Master, the Receiver, the prison system, and the three-judge court itself evaluate the progress being made to correct unconstitutional conditions. At the same time, both the three-judge court and state officials must bear in mind the need for a timely and efficacious remedy for the ongoing violation of prisoners’ constitutional rights.
The State may wish to move for modification of the three-judge court’s order to extend the deadline for the required reduction to five years from the entry of the judgment of this Court, the deadline proposed in the State’s first population-reduction plan. The three-judge court may grant such a request provided that the State satisfies necessary and appropriate preconditions designed to ensure that measures are taken to implement the plan without undue delay. Appropriate preconditions may include a requirement that the State demonstrate that it has the authority and the resources necessary to achieve the required reduction within *544 a 5-year period and to meet reasonable interim directives for population reduction. The three-judge court may also condition an extension of time on the State’s ability to meet interim benchmarks for improvement in provision of medical and mental health care.
The three-judge court, in its discretion, may also consider whether it is appropriate to order the State to begin without delay to develop a system to identify prisoners who are unlikely to reoffend or who might otherwise be candidates for early release. Even with an extension of time to construct new facilities and implement other reforms, it may become necessary to release prisoners to comply with the court’s order. To do so safely, the State should devise systems to select those prisoners least likely to jeopardize public safety. An extension of time may provide the State a greater opportunity to refine and elaborate those systems.
The State has already made significant progress toward reducing its prison population, including reforms that will result in shifting “thousands” of prisoners to county jails. See Supp. Brief for Appellants 1. As the State makes further progress, the three-judge court should evaluate whether its order remains appropriate. If significant progress is made toward remedying the underlying constitutional violations, that progress may demonstrate that further population reductions are not necessary or are less urgent than previously believed. Were the State to make this showing, the three-judge court in the exercise of its discretion could consider whether it is appropriate to extend or modify this timeline.
Experience with the three-judge court’s order may also lead the State to suggest other modifications. The three-judge court should give any such requests serious consideration. The three-judge court should also formulate its orders to allow the State and its officials the authority necessary to address contingencies that may arise during the remedial process.
*545 These observations reflect the fact that the three-judge court’s order, like all continuing equitable decrees, must remain open to appropriate modification. They are not intended to cast doubt on the validity of the basic premise of the existing order. The medical and mental health care provided by California’s prisons falls below the standard of decency that inheres in the Eighth Amendment. This extensive and ongoing constitutional violation requires a remedy, and a remedy will not be achieved without a reduction in overcrowding. The relief ordered by the three-judge court is required by the Constitution and was authorized by Congress in the PLRA. The State shall implement the order without further delay.
The judgment of the three-judge court is affirmed.

It is so ordered.

APPENDIXES
A
18 U. S. C. §8626:
“(a) Requirements for Relief.—
“(1) Prospective relief. — (A) Prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs. The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right. The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief.
“(3) Prisoner release order. — (A) In any civil action with respect to prison conditions, no court shall enter a prisoner release order unless—
*546 “(i) a court has previously entered an order for less intrusive relief that has failed to remedy the deprivation of the Federal right sought to be remedied through the prisoner release order; and
“(ii) the defendant has had a reasonable amount of time to comply with the previous court orders.
“(B) In any civil action in Federal court with respect to prison conditions, a prisoner release order shall be entered only by a three-judge court in accordance with section 2284 of title 28, if the requirements of subparagraph (E) have been met.
“(C) A party seeking a prisoner release order in Federal court shall file with any request for such relief, a request for a three-judge court and materials sufficient to demonstrate that the requirements of subparagraph (A) have been met.
“(D) If the requirements under subparagraph (A) have been met, a Federal judge before whom a civil action with respect to prison conditions is pending who believes that a prison release order should be considered may sua sponte request the convening of a three-judge court to determine whether a prisoner release order should be entered.
“(E) The three-judge court shall enter a prisoner release order only if the court finds by clear and convincing evidence that—
“(i) crowding is the primary cause of the violation of a Federal right; and
“(ii) no other relief will remedy the violation of the Federal right.
“(F) Any State or local official including a legislator or unit of government whose jurisdiction or function includes the appropriation of funds for the construction, operation, or maintenance of prison facilities, or the prosecution or custody of persons who may be released from, or not admitted to, a prison as a result of a prisoner release order shall have standing to oppose the imposition or continuation in effect of such relief and to seek termination of such relief, and shall *547 have the right to intervene in any proceeding relating to such relief.
“(g) Definitions. — As used in this section—
“(4) the term ‘prisoner release order’ includes any order, including a temporary restraining order or preliminary injunctive relief, that has the purpose or effect of reducing or limiting the prison population, or that directs the release from or nonadmission of prisoners to a prison ....”
[Appendix B is on p. 548.]
*548 [[Image here]]
*549 [[Image here]]
*550 [[Image here]]
*551 [[Image here]]

 A similar conclusion was reached by the Little Hoover Commission, a bipartisan and independent state body, which stated that “[o]vercrowded conditions inside the prison walls are unsafe for inmates and staff,” Solving California’s Corrections Crisis: Time Is Running Out 17 (Jan. 2007), and that “California’s correctional system Is in a tailspin,” id., at i.
At trial, current and former California prison officials also testified to the degree of overcrowding. Jeanne Woodford, who recently administered California’s prison system, stated that “ ‘[o]vercrowding in the [California Department of Corrections and Rehabilitation (CDCR)] is extreme, its effects are pervasive and it is preventing the Department from providing adequate mental and medical health care to prisoners,’” Juris. App. 84a. Matthew Cate, the head of the California prison system, stated that “‘overpopulation makes everything we do more difficult.’” Ibid. And Robin Dezember, chief deputy secretary of Correctional Healthcare Services, stated that “we are terribly overcrowded in our prison system” and “overcrowding has negative effects on everybody in the prison system.” Tr. 853, 856.
Experts from outside California offered similar assessments. Doyle Wayne Scott, the former head of corrections in Texas, described conditions in California’s prisons as “appalling,” “inhumane,” and “unacceptable” and stated that "[i]n more than 35 years of prison work experience, I have never seen anything like it.” App. 1337. Joseph Lehman, the former head of correctional systems in Washington, Maine, and Pennsylvania, concluded that “[t]here is no question that California’s prisons are overcrowded” and that “this is an emergency situation; it calls for drastic and immediate action.” Id., at 1312.

 At the time of the three-judge court’s decision, 2006 was the most recent year for which the Special Master had conducted a detailed study of suicides in the California prisons. The Special Master later issued an analysis for the year 2007. This report concluded that the 2007 suicide rate was “a continuation of the CDCR’s pattern of exceeding the national prison suicide rate.” Record in No. 2:90~cv-00520-LKK~JFM (ED Cal), Doc. 3677, p. 1. The report found that the rate of suicides involving inadequate assessment, treatment, or intervention had risen to 82% and concluded that “[tjhese numbers clearly indicate no improvement in this area during the past several years, and possibly signal a trend of ongoing deterioration.” Id., at 12. No detailed study has been filed since then, but in September 2010 the Special Master filed a report stating that “the data for 2010 so far is not showing improvement in suicide prevention.” App. 868.

 Because plaintiffs do not base their case on deficiencies in care provided on any one occasion, this Court has no occasion to consider whether these instances of delay — or any other particular deficiency in medical care complained of by the plaintiffs — would violate the Constitution under Estelle v. Gamble, 429 U. S. 97, 104-105 (1976), if considered in isolation. Plaintiffs rely on systemwide deficiencies in the provision of medical and mental health care that, taken as a whole, subject sick and mentally ill prisoners in California to “substantial risk of serious harm” and cause the delivery of care in the prisons to fall below the evolving standards of decency that mark the progress of a maturing society. Farmer v. Brennan, 511 U. S. 825, 834 (1994).

 In 2007, the last year for which the three-judge court had available statistics, an analysis of deaths in California’s prisons found 68 preventable or possibly preventable deaths. California Prison Health Care Receivership Corp., K. Imai, Analysis of Year 2007 Death Reviews 18 (Nov. 2008). This was essentially unchanged from 2006, when an analysis found 66 preventable or possibly preventable deaths. Ibid. These statistics mean that, during 2006 and 2007, a preventable or possibly preventable death occurred once every five to six days.
Both preventable and possibly preventable deaths involve major lapses in medical care and are a serious cause for concern. In one typical case classified as a possibly preventable death, an analysis revealed the following lapses: “16 month delay in evaluating abnormal liver mass; 8 month delay in receiving regular chemotherapy . . . ; multiple providers fail to *506 respond to jaundice and abnormal liver function tests causing 17 month delay in diagnosis.” California Prison Health Care Receivership Corp., K. Imai, Analysis of Year 2009 Inmate Death Reviews — California Prison Health Care System 12 (Sept. 2010) (hereinafter 2009 Death Reviews).
The three-judge court did not have access to statistics for 2008, but in that year the number of preventable or possibly preventable deaths held steady at 66. California Prison Health Care Receivership Corp., K. Imai, Analysis of Year 2008 Death Reviews 9 (Dec. 2009). In 2009, the number of preventable or possibly preventable deaths dropped to 46. 2009 Death Reviews 11, 13. The three-judge court could not have anticipated this development, and it would be inappropriate for this Court to evaluate its significance for the first time on appeal. The three-judge court should, of course, consider this and any other evidence of improved conditions when considering future requests by the State for modification of its order. See infra, at 543-545.

 Dr. Craig Haney likewise testified that the State had “significantly underestimated the staffing needed to implement critical portions of the Coleman Program Guide requirements,” that “key tasks were omitted when determining staffing workloads,” and that estimates were based on “key assumptions” that caused the State to underestimate demand for mental health care. App. 596-597.

 For instance, Dr. Pablo Stewart reported that one prisoner was referred to a crisis bed but, “[ajfter learning that the restraint room was not available and that there were no crisis beds open, staff moved [the prisoner] back to his administrative segregation cell without any prescribed observation.” App. 736. The prisoner “hanged himself that night in his cell.” Ibid.; see also Juris. App. 99a.

 Correctional officials at trial described several outbreaks of disease. One officer testified that antibiotic-resistant staph infections spread widely among the prison population and described prisoners “bleeding, oozing with pus that is soaking through their clothes when they come in to get the wound covered and treated.” Tr. 601, 604-605. Another witness testified that inmates with influenza were sent back from the infirmary due to a lack of beds and that the disease quickly spread to “more than half” the 340 prisoners in the housing unit, with the result that the unit was placed on lockdown for a week. Id., at 720-721.

 The Plata Receiver concluded that those who believed a population reduction would be a panacea were “simply wrong.” App. 1054-1055. The Receiver nevertheless made clear that “the time this process will take, and the cost and the scope of intrusion by the Federal Court cannot help but increase, and increase in a very significant manner, if the scope and characteristics of [California prison] overcrowding continue.” Id., at 1053. The Coleman Special Master likewise found that a large release of prisoners, without other relief, would leave the violation “largely unmitigated” even though deficiencies in care “are unquestionably exacerbated by overcrowding” and “defendants’ ability to provide required mental health services would be enhanced considerably by a reduction in the overall census” of the prisons. App. 486-487.

 A program of voluntary transfers by the State would, of course, be less restrictive than an order mandating a reduction in the prison population. In light of the State’s longstanding failure to remedy these serious constitutional violations, the three-judge court was under no obligation to consider voluntary population-reduction measures by the State as a workable alternative to injunctive relief.

 The former head of correctional systems in Washington, Maine, and Pennsylvania likewise referred to California’s prisons as “ ‘criminogenic.’ ” Juris. App. 191a. The Yolo County chief probation officer testified that “ ‘it seems like [the prisons] produce additional criminal behavior.’ ” Id., at 190a. A former professor of sociology at George Washington University reported that California’s present recidivism rate is among the highest in the Nation. App. 1246. And the three-judge court noted the report of California’s Little Hoover Commission, which stated that “ ‘[e]aeh year, California communities are burdened with absorbing 123,000 offenders re *536 turning from prison, often more dangerous than when they left.’ ” Juris. App. 191a.

 Philadelphia’s experience in the early 1990’s with a federal-court order mandating reductions in the prison population was less positive, and that history illustrates the undoubted need for caution in this area. One congressional witness testified that released prisoners committed 79 murders and multiple other offenses. See Hearing on S. 3 et al. before the Senate Committee on the Judiciary, 104th Cong., 1st Sess., 45 (1995) (statement of Lynne Abraham, District Attorney of Philadelphia). Lead counsel for the plaintiff class in that case responded that “[t]his inflammatory assertion has never been documented.” Id., at 212 (statement of David Rich-man). The Philadelphia decree was also different from the order entered in this case. Among other things, it “prohibited the City from admitting to its prisons any additional inmates, except for persons charged with, or convicted of, murder, forcible rape, or a crime involving the use of a gun or knife in the commission of an aggravated assault or robbery.” Harris v. Reeves, 761 F. Supp. 382, 384-385 (ED Pa. 1991); see also Crime and Justice Research Institute, J, Goldkamp & M. White, Restoring Accountability in Pretrial Release: The Philadelphia Pretrial Release Supervision Experiments 6-8 (1998). The difficulty of determining the precise relevance of Philadelphia’s experience illustrates why appellate courts defer to the trier of fact. The three-judge court had the opportunity to hear testimony on population-reduction measures in other jurisdictions and to ask relevant questions of informed expert witnesses.

 Expanding such community-based measures may require an expenditure of resources by the State to fund new programs or expand existing ones. The State complains that the order therefore requires it to “divert” savings that will be achieved by reducing the prison population and that setting budgetary priorities in this manner is a “severe, unlawful intrusion on the State authority.” Brief for Appellants 55. This argument is not convincing. The order does not require the State to use any particular approach to reduce its prison population or allocate its resources.