FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| DISABILITY RIGHTS MONTANA, INC., on behalf of all prisoners with serious mental illness confined to the Montana State Prison, | No. 15-35770 |
| *Plaintiff-Appellant*, | D.C. No. 2:15-cv-00022-SEH |
| v. | OPINION |
| MIKE BATISTA, in his official capacity as Director of the Montana Department of Corrections; LEROY KIRKEGARD, in his official capacity as warden of Montana State Prison, | |
| *Defendants-Appellees*. | |

Appeal from the United States District Court
for the District of Montana
Sam E. Haddon, District Judge, Presiding

Argued and Submitted March 7, 2019
Seattle, Washington

Filed July 19, 2019

Before:  Ronald M. Gould and Richard A. Paez, Circuit Judges, and Janis Graham Jack,[*] District Judge.

Opinion by Judge Gould

---

## SUMMARY[**]

### Prisoner Civil Rights

The panel reversed the district court's dismissal of a prisoner civil rights complaint, remanded for further proceedings, and reassigned the case to a different district court judge.

Plaintiff, Disability Rights Montana, alleged pursuant to 42 U.S.C. § 1983 that the Director of the Montana Department of Corrections and the Warden of the Montana State Prison violated the Eighth Amendment rights of "all prisoners with serious mental illness who are confined to the Montana State Prison."  The district court dismissed the complaint for failing to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6).

The panel held that the complaint, which described the horrific treatment of prisoners, was supported by factual allegations more than sufficient to "state a claim to relief that was plausible on its face" under *Bell Atlantic Corp. v.*

---

[*] The Honorable Janis Graham Jack, United States District Judge for the Southern District of Texas, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

*Twombly*, 550 U.S. 544, 570 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

The panel noted that the complaint alleged that prisoners with serious mental illness were denied diagnosis and treatment of their conditions, described a distressing pattern of placing mentally ill prisoners in solitary confinement for "weeks and months at a time" without significant mental health care, alleged the frequent, improper use of this punishment for behavior arising from mental illness, marshalled relevant quotations from national prison health organizations about the unacceptability of subjecting prisoners to extensive solitary confinement, and alleged that the defendants did not respond appropriately to threats of suicide by mentally ill prisoners, increasing the risk of suicide.  With respect to the subjective prong of the Eighth Amendment claim, the complaint also included more than sufficient allegations that defendants knew that prisoners with serious mental illness were being exposed to a substantial risk of serious harm and were indifferent to that risk.

The panel held that reassignment to a different district court judge was required to preserve the appearance of justice.  The panel noted that the district court had mistaken this case for another case brought by plaintiff against a different defendant and upon being advised of its mistake, had declined to revisit its decision, thereby letting an obviously incorrect decision stand.

**COUNSEL**

Jeffrey A. Simmons (argued), Foley & Lardner LLP, Madison, Wisconsin; Alex Rate (argued), American Civil Liberties Union of Montana, Missoula, Montana; Kyle Gray and Adrian Miller; Holland & Hart LLP, Billings, Montana; Plaintiff-Appellant.

Thomas J. Leonard (argued), William L. Crowley, Mary Cile Glover-Rogers, Boone Karlberg P.C., Missoula, Montana; Colleen E. Ambrose, Special Assistant Attorney General, Montana Department of Corrections, Helena, Montana; for Defendants-Appellees.

Elisabeth Centeno Lopez, Alexandre H. Rene, Helen Vera, and Jonathan R. Ference-Burke, Ropes & Gray LLP, Washington, D.C.; Diane Smith Howard, National Disability Rights Network, Washington, D.C.; for Amici Curiae National Disability Rights Network and Ten Jurisdictions' Protection and Advocacy Agencies.

---

**OPINION**

GOULD, Circuit Judge:

Disability Rights Montana, Inc. ("DRM") alleges, pursuant to 42 U.S.C. § 1983, that the Director of the Montana Department of Corrections and the Warden of the Montana State Prison (the "DOC defendants") have violated the Eighth Amendment rights of "all prisoners with serious mental illness who are confined to the Montana State Prison." The district court dismissed DRM's complaint for failing to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). However, DRM's complaint, which

describes the horrific treatment of prisoners, is supported by factual allegations more than sufficient to "state a claim to relief that is plausible on its face" under *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). We therefore reverse the district court's dismissal of the complaint, remand for further proceedings, and reassign the case to a different district court judge.

# I

## A

The Protection and Advocacy for Individuals with Mental Illness Act, 42 U.S.C. § 10801 et seq. ("PAIMI Act"), provides funds to maintain state level agencies for the protection of and advocacy for individuals with mental illness, and provides those designated agencies with the authority to investigate and seek legal remedies for abuse of such individuals. 42 U.S.C. § 10807(a). Plaintiff DRM is the PAIMI agency for Montana. As such, DRM is the organization tasked by Congress with "ensur[ing] that the rights of individuals with mental illness are protected" and "protect[ing] and advocat[ing] for the rights of such individuals through activities to ensure the enforcement of the Constitution and Federal and State statutes" for Montana's mentally ill individuals. 42 U.S.C. § 10801(b)(1)–(2).

Under this authority, DRM challenges the treatment of individuals with serious mental illness in the Montana State Prison.[1] DRM claims that the DOC defendants have

---

[1] The district court expressed skepticism about whether the term "serious mental illness" has a legally cognizable meaning. It is unclear

violated the rights of "all prisoners with serious mental illness who are confined to the Montana State Prison . . . to be free from cruel and unusual punishment" though policies and practices in place at the prison. DRM's complaint is divided into roughly three sections. The first section of the complaint contains system-wide allegations about the treatment of inmates with "serious mental illness" in the Montana prison. The second section contains detailed allegations about particular inmates to illustrate the treatment seriously mentally ill patients are given in Montana's prison. The third section alleges several different ways that the DOC defendants had been placed on notice of the risks posed by their treatment of prisoners with serious mental illness.

The complaint alleges that the defendants act under the color of state law in administering the prison and that they remain responsible for administering the policies and practices that are the subject of the complaint. Specifically, the complaint isolates nine prison practices and/or policies that DRM contends are constitutionally suspect:

1) placing prisoners with serious mental illness in various forms of solitary confinement for 22 to 24 hours per day for months and years at a time;

---

from the record what motivates this skepticism, but we note that the Supreme Court's decision in *Brown v. Plata* was itself concerned with "[p]risoners in California with serious mental illness" and directly held that such prisoners are entitled to a certain standard of mental health care. 563 U.S. 493, 503 (2011); *see also Coleman v. Wilson*, 912 F. Supp. 1282, 1301 (E.D. Cal. 1995) (holding that case law sufficiently "provides a legal gloss" on the term "serious mental disorder"). Both our court and the district court lack authority to second guess this holding. Moreover, the complaint alleges a specific definition of "serious mental illness."

2) placing prisoners with serious mental illness on behavior management plans that involve solitary confinement and extreme restrictions of privileges;

3) having no standards for determining whether placing a prisoner with serious mental illness in solitary confinement or on a behavior management plan will be harmful to the prisoner's mental health;

4) engaging in a pattern of refusing to properly diagnose prisoners as suffering from serious mental illness;

5) engaging in a pattern of refusing to provide prisoners with medications for serious mental illness;

6) failing to have a system in place to review and evaluate the diagnosing and prescribing practices of its mental health staff;

7) failing to have a system to classify prisoners according to their mental health needs;

8) failing to adequately consider prisoners' serious mental illnesses when making decisions about prisoners' housing and custody levels; and

9) having no system in place for auditing, evaluating or ensuring the effectiveness of its mental health care program in treating prisoners with serious mental illness.

The complaint goes on to allege specific facts supporting the existence of these policies and their effect on prisoners with serious mental illness. For instance, the complaint alleges that the mental health treatment community has established that "subjecting prisoners to extended periods of

solitary confinement is detrimental to their mental health," citing statements from national correctional health organizations on the inappropriateness of using such punishments on the seriously mentally ill.  The complaint then describes in detail the solitary confinement procedures used at the prison, alleging that "[t]he Prison regularly places prisoners with serious mental illness in all of the forms of solitary confinement described above for weeks and months at a time."  The complaint alleges that prison staff identify individuals with serious mental illness as "good candidates" for solitary confinement, placing them in solitary confinement for weeks and months at a time.  The complaint further alleges that the DOC defendants subject prisoners to being locked alone in their cells for 22 to 24 hours a day, seven days a week, and that while in solitary confinement, a prisoner's "primary contact with mental health staff . . . lasts no more than a few minutes and is conducted at the prisoner's cell door," with no privacy from other prisoners or staff.  Throughout the first section, the complaint supports its objection to each of the policies and practices listed with specific factual descriptions of how prisoners are typically treated and the accessibility and quality of mental health care at the prison.

The second section of the complaint provides allegations, consistent with the system-wide allegations, concerning nine individual prisoners.  In substance, the allegations are horrifying, involving prisoners with very severe symptoms of mental illness who went largely untreated and who were subjected to extreme and lengthy solitary confinement punishments.  The policies and practices DRM alleged to be in place at the prison are evident in these examples.  The facts alleged in these illustrative examples include numerous instances of prison mental health staff deciding to limit prisoners' access to prescribed

mental health medication, including staff denying mentally-ill inmates their medications entirely.  In graphic detail, DRM's complaint describes how these policies and practices allegedly harm the mental health of prisoners, harm that allegedly culminated in the suicides of three of the described prisoners.[2]

The third section of DRM's complaint specifically alleges the DOC defendants' involvement in the complained of policies and practices.  DRM alleges that defendants are aware of the fact that solitary confinement harms prisoners with serious mental illness, are aware of prison mental health standards that contradict their practices, have no standards for guiding mental health staff in the punishment of prisoners misbehaving because of mental illness, have been made aware of the plight of seriously mentally ill prisoners through repeated administrative and grievance proceedings, have been sued twice in Montana for their treatment of mentally ill prisoners, and have been repeatedly informed of the deficiencies of their treatment of prisoners with serious mental illness by DRM itself.  Based on this description of the DOC defendants' knowledge of the objectionable policies, DRM finally alleges that "[g]iven their knowledge of these practices, and their knowledge of the serious harm that can be caused by these practices, and their refusal to change these practices, the DOC Defendants have been deliberately indifferent to the serious medical needs of prisoners with serious mental illness."

---

[2] The district court expressed skepticism about the legal relevance of facts about deceased prisoners to the current claim.  But these allegations, if true, would clearly provide powerful support to DRM's claim that Montana's punishing treatment of prisoners with serious mental illness is constitutionally defective. *See e.g.*, *Plata*, 563 U.S. at 508, 519 (discussing the suicides of prisoners kept in administrative segregation as evidence of defective prison mental health care).

**B**

DRM initially included these Eighth Amendment claims against the DOC defendants in a broader suit that also alleged due process claims against the Montana Department of Public Health and Human Services ("DPHHS"). The due process claims concerned how people convicted as "Guilty But Mentally Ill" were transferred between the Montana State Hospital and the Montana State Prison. At a status conference, the district court orally ordered DRM to replead its claims in separate complaints, confusingly theorizing that there should be three separate cases.**[3]** DRM then filed two separate complaints—separating the Eighth Amendment claims against the DOC defendants from the due process claims against the DPHHS. This appeal only concerns the case against the DOC defendants.

Shortly after the claims were separated, the DOC defendants filed a motion to dismiss the Eighth Amendment case for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). The district court decided this motion in a hearing held immediately after a hearing on a motion to dismiss in the separate case brought against the DPHHS. At the conclusion of the hearing in the present case, the district court orally granted the motion to dismiss, ostensibly holding that the claims were not "adequately pleaded to withstand this *Iqbal*/*Twombly* Motion to Dismiss." However, the court's stated rationale was focused entirely on the due process claims that were at issue in the suit against DPHHS, repeatedly mentioning "liberty interest,"

---

**[3]** The district court left counsel "discretion" in how to design the new complaints, but suggested they might be separated into the claims of deceased prisoners, seriously mentally ill prisoners, and Guilty But Mentally Ill prisoners. Those three categories of prisoners are not mutually exclusive.

"transfer," and a statute governing transfers between the hospital and the prison.  The court did not give an explanation as to how DRM had failed to plead an Eighth Amendment claim against the DOC defendants.  The DPHHS defendants filed a motion requesting that the district court revisit its orders on the motions on the basis that the court had mistaken the two cases for one another.  Before DRM could do the same, the district court issued an order denying the motion and again stating that it had correctly dismissed the case against the DOC defendants.  This appeal resulted.

## II

### A

We review dismissals under rule 12(b)(6) *de novo*. *Applied Underwriters, Inc. v. Lichtenegger*, 913 F.3d 884, 890 (9th Cir. 2019).  The standard for surviving a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) after the Supreme Court's decisions in *Twombly* and *Iqbal* is that the plaintiff must provide "a short and plain statement of the claim showing the pleader is entitled to relief" which "contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Sheppard v. David Evans & Assoc.*, 694 F.3d 1045, 1048 (9th Cir. 2012) (citing *Twombly*, 550 U.S. at 555, and *Iqbal*, 556 U.S. at 678).  To meet this burden, "the nonconclusory 'factual content'" of DRM's complaint and "reasonable inferences from that content," must be at least "plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009) (citing *Twombly*, 550 U.S. at 557).  We must "take all allegations of material fact as true and construe them in the light most favorable to the nonmoving party." *Steinle v. City and Cty. of S.F.*, 919

F.3d 1154, 1160 (9th Cir. 2019) (quoting *Parks Sch. of Bus., Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995)).

## B.

With respect to the substance of DRM's complaint asserting a 42 U.S.C. § 1983 violation of prisoners' right to be free of cruel and unusual punishment, a large body of Supreme Court law governs, most recently the Supreme Court's decision in *Brown v. Plata*, where the Supreme Court explained that "[t]he basic concept underlying the Eighth Amendment is nothing less than the dignity of man." *Brown v. Plata*, 563 U.S. 493, 510 (2011) (quoting *Atkins v. Virginia*, 536 U.S. 304, 311 (2002)). Consistent with that concept and the clear connections between mental health treatment and the dignity and welfare of prisoners, the Eighth Amendment's prohibition against cruel and unusual punishment requires that prisons provide mental health care that meets "minimum constitutional requirements." *Id.* at 501; *see also Doty v. Cty. of Lassen*, 37 F.3d 540, 546 (9th Cir. 1994) (holding that "the requirements for mental health care are the same as those for physical health care needs"). When the level of a prison's mental health care "fall[s] below the evolving standards of decency that mark the progress of a maturing society," the prison fails to uphold the constitution's dignitary principles. *Plata,* 563 U.S. at 505 n.3.

"A prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment." *Farmer v. Brennan*, 511 U.S. 825, 828 (1994) (citing *Helling v. McKinney*, 509 U.S. 25 (1993)); *see also Parsons v. Ryan*, 754 F.3d 657, 677 (9th Cir. 2014); *Graves v. Arpaio*, 623 F.3d 1043, 1049 (9th Cir. 2010); *Wallis v. Baldwin*, 70 F.3d 1074, 1076 (9th Cir. 1995). Where a plaintiff alleges systemwide deficiencies, "policies

and practices of statewide and systematic application [that] expose all inmates in [the prison's] custody to a substantial risk of serious harm," we assess the claim through a two-pronged inquiry. **[4]** *Parsons*, 754 F.3d at 676; *see also Plata*, 563 U.S. at 505 n.3 (noting that "[p]laintiffs rely on systemwide deficiencies in the provision of medical and mental health care that, taken as a whole, subject sick and mentally ill prisoners in California to 'substantial risk of harm'"). The first, objective, prong requires that the plaintiff show that the conditions of the prison pose "a substantial risk of serious harm." *Farmer*, 511 U.S. at 834 (1994) (citing *Helling*, 509 U.S. at 35). The second, subjective, prong requires that the plaintiff show that a prison official was deliberately indifferent by being "aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists," and "also draw[ing] the inference." *Farmer*, 511 U.S. at 837.

Consistent with this well-established precedent, DRM's complaint states a claim and survives a motion to dismiss under Rule 12(b)(6) if it contains sufficient factual allegations to make it plausible, taking all the allegations as true, that (1) the prison policies and practices DRM describes expose inmates with serious mental illness to a substantial risk of serious harm and (2) that the DOC defendants are deliberately indifferent to that risk.

---

**[4]** These cases are different from those in which a plaintiff alleges "that the care provided on any particular occasion to any particular inmate (or group of inmates) was insufficient." *Parsons*, 754 F.3d at 677. Moreover, cases like this one for official or supervisory liability must meet a different standard than cases for municipal liability. The DOC defendants' numerous citations to the municipal liability standard are therefore unhelpful.

**III**

The district court's oral ruling on the motion appears to have confused this case with the case filed against the DPHHS. Despite ostensibly ruling that DRM had failed to meet the *Twombly*/*Iqbal* pleading standard, the district court did not engage with the factual allegations in DRM's complaint, choosing instead to discuss the possible existence of a due process liberty interest based on the facts alleged against the DPHHS in the other case. Because the district court declined to reconsider or further explain its ruling, our *de novo* review of the district court's order is the first application of the *Iqbal*/*Twombly* standard to DRM's complaint. We conclude that DRM has stated a claim on which relief could be granted. DRM's complaint plausibly alleges that the DOC defendants were deliberately indifferent under the established two-prong test, and it alleges specific facts to support each element.[5]

**A**

DRM's complaint contains sufficient factual allegations to make it plausible that the prison's policies and practices pose a substantial risk of serious harm to prisoners with serious mental illness, satisfying the objective element. DRM made extensive factual allegations about the effect that the prison's punishment practices have on prisoners with serious mental illness. DRM's complaint alleged that prisoners with serious mental illness are denied diagnosis and treatment of their conditions, described a distressing

---

[5] The DOC defendants' contention that DRM does not have standing to seek injunctive or declaratory relief pursuant to the Prison Litigation Reform Act ("PLRA") is baseless. The PLRA addresses the scope of injunctive relief and not the pleading requirements plaintiffs face. *See* 18 U.S.C. § 3626(a)(1)(A).

pattern of placing mentally ill prisoners in solitary confinement for "weeks and months at a time" without significant mental health care, alleged the frequent, improper use of this punishment for behavior arising from mental illness, marshalled relevant quotations from national prison health organizations about the unacceptability of subjecting prisoners to extensive solitary confinement, and alleged that the defendants did not respond appropriately to threats of suicide by mentally ill prisoners, increasing the risk of suicide. Far from being "a wholly conclusory statement" of its claim, DRM's complaint provides detailed allegations on each of these points, reflecting significant information about the function of the prison and its policies with respect to the seriously mentally ill. *Twombly*, 550 U.S. at 561.

These allegations, by themselves, were enough to make it plausible that prison policies and practices pose a substantial risk of serious harm. *See Sheppard*, 694 F.3d at 1048–49. But these allegations make up only a portion DRM's complaint. About half of the complaint included further factual allegations supporting the existence of harmful prison policies and the risk of serious harm that they pose. There were allegations that the defendants' policies caused prisoners' mental health to get substantially worse, resulted in prisoners inflicting self-harm, and contributed, on at least three occasions, to prisoners committing suicide. To require more would overstate what needs to be alleged to state a claim at the beginning of a lawsuit before discovery. *See Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011).

Analyzing the sufficiency of a complaint is "a context specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. The complaint's allegations that these practices and policies compromise the health and dignity of prisoners with

serious mental illness are thoroughly consistent with common sense and legal experience. *See, e.g.*, *Plata*, 563 U.S. at 503–04 (noting that prisoners "with serious mental illness do not receive minimal, adequate care" when they spend "months in administrative segregation" with "harsh and isolated conditions" and "limited mental health services"); *Graves v. Arpaio*, 48 F. Supp. 3d 1318, 1335 (D. Ariz. 2014) ("Holding inmates with serious mental illness in prolonged isolated confinement may cause serious illness and needless suffering in violation of the Eighth Amendment."); *Coleman v. Brown*, 938 F. Supp. 3d 955, 979–80 (E.D. Cal. 2013) (holding that "seriously mentally ill inmates placed in administrative segregation units continued to face a substantial risk of harm"); *Coleman v. Wilson*, 912 F. Supp. 1282, 1320–22 (E.D. Cal. 1995) (holding that a prison violated the Eighth Amendment by imposing administrative segregation on mentally ill inmates without providing proper care). DRM's allegations are also consistent with the expert evidence quoted in the complaint and provided by the amicus brief, which argues that "medical and social-science researchers . . . have demonstrated that solitary confinement can lead to or exacerbate mental illness and psychological deterioration," including increasing the risk of suicide. DRM's complaint plausibly alleges that prison policies and practices pose a substantial risk of serious harm to prisoners who are seriously mentally ill.

**B**

With respect to the subjective prong of DRM's Eighth Amendment claim, the complaint also includes more than sufficient allegations. DRM provides four different kinds of support for its claim that the DOC defendants knew that prisoners with serious mental illness are being exposed to a

substantial risk of serious harm and were indifferent to that risk. *See Farmer*, 511 U.S. at 842 (holding that "it is enough that the official acted or failed to act despite his knowledge of substantial risk of serious harm"). DRM's complaint alleged (1) that Montana's prison has been sued twice complaining about factually similar conditions at the prison, (2) that the prison sought certification from a national prison health care body whose mental health care standards would put them on notice of these problems, (3) that the DOC defendants receive regular grievances and appeals from prisoners complaining about the prison's treatment of their mental illness, and (4) that DRM itself has "repeatedly informed Prison officials of the serious deficiencies in the Prison's treatment of prisoners with serious mental illness." Each of these allegations, if taken as true, plausibly supports the view that the DOC defendants knew about the risks to which prisoners were exposed and that the DOC defendants deliberately chose to maintain the harmful policies. *See, e.g.*, *Lemire v. Cal. Dep't of Corr. and Rehab.*, 726 F.3d 1062, 1078 (9th Cir. 2013) (concluding that plaintiffs stated a claim for deliberate indifference where "litigation specifically alerted prison officials to the acute problem of inmate suicides"); *Hunt v. Dental Dep't*, 865 F.2d 198, 201 (9th Cir. 1989) (holding that a dispute of fact prevented summary judgment on deliberate indifference where a grievance form could have put defendant on notice to plaintiff's request for treatment).

Defendants argue that these allegations are insufficient to defeat a motion to dismiss on the subjective prong of the Eighth Amendment inquiry. But the information in DRM's complaint speaks to precisely the sort of "circumstances [that] suggest that the defendant-official being sued had been exposed to information concerning the risk . . . sufficient to permit a trier of fact to find that the defendant official had

actual knowledge of the risk." *Farmer*, 511 U.S. at 842–43. Even independent of these allegations, it is plausible that DRM's allegations could succeed because of an inference that "the official[s] knew of a substantial risk from the very fact that the risk was obvious." *Id.* at 842.

## IV

DRM contends that the case should be reassigned to a different district court judge on remand. "Absent proof of personal bias on the part of the district judge, remand to a different judge is proper only under unusual circumstances." *United States v. Reyes*, 313 F.3d 1152, 1159 (9th Cir. 2002). We have long held that whether these unusual circumstances obtain depends on three factors:

> (1) whether the original judge would reasonably be expected upon remand to have substantial difficulty in putting out of his or her mind previously-expressed views or findings determined to be erroneous or based on evidence that must be rejected, (2) whether reassignment is advisable to preserve the appearance of justice, and (3) whether reassignment would entail waste and duplication out of proportion to any gain in preserving the appearance of fairness.

*United States v. Arnett*, 628 F.2d 1162, 1165 (9th Cir. 1979) (quoting *United States v. Robin*, 553 F.2d 8, 10 (2d Cir. 1977) (en banc)); *see also Evon v. Law Offices of Sidney Mickell*, 688 F.3d 1015, 1034 (9th Cir. 2012) (applying these factors from *Arnett*). These factors are not evenly weighed, however, and we have established that "[t]he first two factors are equally important, and a finding of either is sufficient to support reassignment on remand." *Krechman v. Cty. of*

*Riverside*, 723 F.3d 1104, 1112 (9th Cir. 2013) (citing *United States v. Sears, Roebuck & Co., Inc.*, 785 F.2d 777, 780 (9th Cir. 1986)); *see also Manley v. Rowley*, 847 F.3d 705, 712–13 (9th Cir. 2017).

In this case, although we do not suggest that the district court acted with ill will or with actual bias against plaintiffs, we hold that reassignment is required to preserve the appearance of justice.  When the district court dismissed DRM's claims, its oral reasoning concerned the case against the DPHHS defendants, and in our view had nothing to do with this case.  The district court was then presented with a motion by the DPHHS defendants pointing out that the district court had erred in confusing the case against the DOC defendants with the case against the DPHHS defendants.  Yet, the district court declined to revisit its decision, letting an obviously incorrect decision stand that resulted in this appeal with the issues it presents.  Because the district court did not correct its mistake and issue a reasoned decision, the district court's error has more impact on plaintiffs than a mere oversight.

As we have previously held, "adamancy in erroneous rulings may justify remand to [a] different judge."  *Reyes*, 313 F.3d at 1159–60 (citing *Sears, Roebuck & Co.*, 785 F.2d at 780).  This holding reflects the sound reasoning that judges who have insisted on erroneous rulings, even when their errors are obvious and have been highlighted for the court, might not appear to the disfavored parties to be likely to decide in accord with the law in the future.  When a district court errs in this way, especially when the court gives no plausible justification for its decision, parties and observers may justifiably doubt whether the future disposition of their matter in the continuing proceedings will be based on proper considerations of law and equity.  In such circumstances, we

conclude that the appearance of justice requires that judicial decisions be responsive to the facts and rational arguments before the court.  The appearance of justice is undermined when a court's actions are unresponsive to those considerations.  When a court confuses two different cases and chooses to erroneously dismiss a party's claim rather than to revisit its decision, its actions are sufficiently unresponsive to those considerations as to merit reassignment.  Because this case remains at the pleading stage, "any duplication of judicial efforts will be minimal," and the benefits of reassigning will far outweigh the costs. *Manley*, 847 F.3d at 713.

## V

This case is controlled by the Supreme Court's decisions in *Brown v. Plata* and in *Farmer v. Brennan*.  Under *Brown v. Plata*, an Eighth Amendment claim is made out if prisoners with serious mental illnesses face a substantial risk of serious harm, and this is met with deliberate indifference to their condition.  This makes good sense because once persons are incarcerated, they can no longer see to their own medical needs.  In these circumstances, the state, which incarcerated them and limited their ability to seek care for themselves, stands in a unique relation that requires it to provide necessary medical care and protect against serious medical risks.  Under *Farmer*, a prisoner meets the first prong of the test for cruel and unusual punishment if he or she can show that prison policies or practices pose a "substantial risk of serious harm."  The second prong is met upon showing of deliberate indifference, which, as *Farmer* makes clear, is shown adequately when a prison official is aware of the facts from which an inference could be drawn about the outstanding risk, and the facts permit us to infer that the prison official in fact drew that inference, but then

consciously avoided taking appropriate action.  Here, the facts alleged are adequate to support the claim that has been asserted under these principles.

*Iqbal* and *Twombly* require only that a plausible claim be alleged, not that it can be proven with certainty.  Enough facts are plausibly alleged in the complaint so that this matter should not have been dismissed without further process.  We reverse the district court's judgment and remand to a different district court judge for further proceedings consistent with this opinion.

**REVERSED AND REMANDED.**