**Electronically Filed
Supreme Court
SCPW-20-0000200
05-JUN-2020
12:23 PM**

SCPW-20-0000200 and SCPW-20-0000213

IN THE SUPREME COURT OF THE STATE OF HAWAIʻI

_____

SCPW-20-0000200

OFFICE OF THE PUBLIC DEFENDER, Petitioner,

vs.

CLARE E. CONNORS, Attorney General of the State of Hawaiʻi;
DONALD S. GUZMAN, Prosecuting Attorney, County of Maui;
MITCHELL D. ROTH, Prosecuting Attorney, County of Hawaiʻi;
JUSTIN F. KOLLAR, Prosecuting Attorney, County of Kauaʻi;
DWIGHT K. NADAMOTO, Acting Prosecuting Attorney,
City and County of Honolulu, Respondents.

----------------------------------------------------------------

SCPW-20-0000213

STATE OF HAWAIʻI OFFICE OF THE PUBLIC DEFENDER, Petitioner,

vs.

DAVID Y. IGE, Governor, State of Hawaiʻi; NOLAN P. ESPINDA,
Director, State of Hawaiʻi Department of Public Safety;
EDMUND (FRED) K.B. HYUN, Chairperson, Hawaiʻi Paroling Authority;
Respondents.

_____

ORIGINAL PROCEEDING

DISSENT RE: ORDER CONCLUDING MATTERS
IN THIS CONSOLIDATED PROCEEDING
(By: Wilson, J.)

## I.   Introduction

The Novel coronavirus ("COVID-19" or "the virus") is spreading around the world at an alarming rate.  On March 11, 2020, the World Health Organization declared a global COVID-19 pandemic and called for countries to take "urgent and aggressive action."[1]  As of March 27, 2020, the date of our initial order in this case,[2] the United States surpassed China in its number of reported COVID-19 cases, with 93,568 reported cases and over 1,400 deaths.[3]  The number of reported cases in the United States has since grown at a staggering rate.  As of June 5, 2020, the Center for Disease Control reported 1,842,101 total cases in the United States—14,676 cases more than the day before.[4]  The virus

---

[1]    WHO Director-General's Opening Remarks, WORLD HEALTH ORGANIZATION (Mar. 11, 2020), https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-world-health-assembly (last visited June 5, 2020).

[2]    Interim Order filed Mar 27, 2020.

[3]    Coronavirus Map: Tracking the Global Outbreak, N.Y. Times (updated Mar. 27, 2020), https://www.nytimes.com/interactive/2020/world/coronavirus-maps.html?action=click&pgtype=Article&state=default&module=styln-coronavirus&variant=show&region=TOP_BANNER&context=storyline_menu?action=click&pgtype=Article&state=default&module=styln-coronavirus&variant=show&region=TOP_BANNER&context=storyline_menu; Donald G. McNeil Jr., The U.S. Now Leads the World in Confirmed Coronavirus Cases, THE NEW YORK TIMES (Mar. 26, 2020), https://www.nytimes.com/2020/03/26/health/usa-coronavirus-cases.html.

[4]    Cases in the U.S., CTRS. FOR DISEASE CONTROL & PREVENTION (June 5, 2020), https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html.

has killed at least 103,700 people in the United States.[5] Science and statistics constitute unequivocal evidence that COVID-19 is a growing lethal threat to citizens in the United States.[6]

As a result of the grave nature of this public health threat, Hawaiʻi is now in an officially declared state of emergency. To protect Hawaiʻi's citizens from the present threat to human life, Hawaiʻi Governor David Ige, and all four county mayors in Hawaiʻi, imposed a state of emergency and issued rules and orders restricting daily activities of residents and businesses.[7]

---

[5] COVID-19 has killed more than twice the number of Americans killed in the Vietnam War. David Welna, Coronavirus Has Now Killed More Americans Than Vietnam War, NATIONAL PUBLIC RADIO (Apr. 28, 2020), https://www.npr.org/sections/coronavirus-live-updates/2020/04/28/846701304/pandemic-death-toll-in-u-s-now-exceeds-vietnam-wars-u-s-fatalities.

[6] Approximately twenty percent of people infected experience life-threatening complications requiring hospitalization, and according to World Health Organization director Tedros Adhanom Ghebreyesus, the death rate for those infected is 3.4%. Brian Resnick and Christina Animashaun, Why COVID-19 Is Worse Than The Flu, IN ONE CHART, VOX (Mar. 18, 2020), https://www.vox.com/science-andhealth/2020/3/18/21184992/coronavirus-covid-19-flu-comparison-chart.

[7] COVID-19 Emergency Proclamation, OFFICE OF THE GOVERNOR, STATE OF HAW. (Mar. 4, 2020), https://governor.hawaii.gov/wp-content/uploads/2020/03/2003020-GOV-Emergency-Proclamation_COVID-19.pdf (last visited June 5, 2020); Supplementary Proclamation, OFFICE OF THE GOVERNOR, STATE OF HAW. (Mar. 16, 2020), https://governor.hawaii.gov/wp-content/uploads/2020/03/2003109-ATG_COVID-19-Supplementary-Proclamation-signed.pdf (last visited June 5, 2020); Second Supplementary Proclamation, OFFICE OF THE GOVERNOR, STATE OF HAW. (Mar. 21, 2020), https://governor.hawaii.gov/wp-content/uploads/2020/03/2003152-ATG_Second-Supplementary-Proclamation-for-COVID-19-signed.pdf (last visited June 5, 2020); Third Supplementary Proclamation, OFFICE OF THE GOVERNOR, STATE OF HAW. (Mar. 23, 2020),

(. . . continued)

On March 23, 2020, following the guidance of the Hawaiʻi Department of Health, Governor Ige issued an emergency proclamation "Stay-at-Home Order" ("Order") that provided mandatory guidance to individuals, businesses, and operations within the State of Hawaiʻi.  The Order carries "the force and effect of law" pursuant to HRS § 127A-25, mandating that the people of Hawaiʻi follow strict social distancing guidelines in order to prevent the spread of COVID-19.[8]

In Governor Ige's Third Supplementary Proclamation, issued March 23, 2020, he warns of "unmanageable strains on our healthcare system and other catastrophic impacts to the State" posed by "the dangers of COVID-19."  Third Supplementary Proclamation at 1.  The Governor ordered the State "to mandate and effectuate social distancing measurers throughout the State in order to reduce the spread of COVID-19."  Id.  "All persons

(continued. . . )

https://governor.hawaii.gov/wp-content/uploads/2020/03/2003162-ATG_Third-Supplementary-Proclamation-for-COVID-19-signed.pdf (last visited June 5, 2020)  [hereinafter Third Supplementary Proclamation]; Public Health Emergency Rules, Amended March 22, 2020, OFFICE OF THE MAYOR, CTY. OF MAUI (Mar. 22, 2020), https://www.mauicounty.gov/DocumentCenter/View/121462/Amended-2020-3-22-Mayors-Public-Health-Emergency-Rules (last visited June 5, 2020); Mayor's Emergency Rule #5, OFFICE OF THE MAYOR, CTY. OF KAUAʻI (Mar. 24, 2020), http://www.kauai.gov/Portals/0/Civil_Defense/Emergency%20Proclamations/Mayor%27s%20Emergency%20Rule%20%235_20200324.pdf; Mayors COVID-19 Second Supplementary Emergency Proclamation, OFFICE OF THE MAYOR, CTY. OF HAW. (Mar. 24, 2020), http://records.hawaiicounty.gov/WebLink/PDF/pfhqbtbqdexu2nzhtx1gt2nn/77/Mayors%20COVID-19%20Second%20Supplementary%20Emergency%20Proclamation.pdf.

[8]     Third Supplementary Proclamation, supra note 7.

4

shall maintain a minimum of six-feet of physical separation from all other persons to the fullest extent possible." Id. at 7. Likewise, the Order requires that "businesses and operations shall make hand sanitizer and sanitizing products readily available for employees and customers." Id.

In the week preceding the March 4, 2020 emergency declaration by Governor Ige, a total of 106 cases were confirmed. Since March 2, 2020, the number of cases has grown to 652 statewide and seventeen people have died.[9] The Department of Health for the State of Hawai'i warned Hawai'i's residents on its website on June 1, 2020 that "Covid-19 is spreading globally, nationally, and now locally."[10] To contend with the emergency and prevent further spread of the virus among the community, tourism has essentially been halted by the requirement of a fourteen day quarantine for those who visit Hawai'i, restaurants are closed to all but take-out service, and people are requested to stay at home whenever possible.[11]

---

[9] Latest Cases in Hawai'i, DISEASE OUTBREAK CONTROL DIV., STATE OF HAW. – DEP'T OF HEALTH, https://health.hawaii.gov/coronavirusdisease2019/(last visited June 5, 2020).

[10] Current Situation in Hawaii, DISEASE OUTBREAK CONTROL DIV., STATE OF HAW. – DEP'T OF HEALTH, https://health.hawaii.gov/coronavirusdisease2019/what-you-should-know/current-situation-in-hawaii/ (last visited June 5, 2020).

[11] The dire nature of the measures taken to protect Hawai'i's people from the COVID-19 emergency has caused unprecedented unemployment, with March 2020 unemployment claims increasing by 3,766.4% from the same month in 2019.

(. . . continued)

Preeminent among the protections identified as emergency measures by the Governor to prevent the hyper-contagious virus from rampantly spreading from person-to-person is social distancing.  All persons are directed to stay at a distance of six feet from one another whenever practicable.[12]  Our community has rallied behind this common-sense method of preventing infection, practiced by all branches of the Hawaiʻi State Government.  To protect Hawaiʻi's elected leaders and the members of the public from in-person contact at the Hawaiʻi State Capitol, the Hawaiʻi State legislature suspended its current session.[13]  The Hawaiʻi State Judiciary has also instituted practices of social distancing to protect judiciary employees and the public from the spread of the COVID-19 infection.[14]

---

(continued. . . )

Olivia Peterkin, Hawaii unemployment reaches historic highs, PACIFIC BUSINESS NEWS (Apr. 3, 2020). https://www.bizjournals.com/pacific/news/2020/04/03/hawaii-unemployment-reaches-historic-highs.html.

[12]    Third Supplementary Proclamation, supra note 7.

[13]    After state Senator Clarence Nishihara tested positive for COVID-19, the Hawaiʻi legislature immediately closed and suspended the legislative session.  Senate President Ron Kouchi stated that "In an abundance of caution, we just thought it would be better to send everybody home and then let the Department of Health start its process[.]"  State Capitol building closes after senator tests positive for coronavirus, HAW. NEWS NOW (Mar. 19, 2020), https://www.hawaiinewsnow.com/2020/03/19/state-senator-tests-positive-coronavirus-first-known-case-linked-state-capitol-building/.

[14]    On March 16, 2020, Chief Justice Mark Recktenwald issued an Order limiting in-person court proceedings and directing "[e]ach judicial circuit [to] issue orders and adjust court operations as warranted to address the urgent and rapidly evolving public health conditions[.]"  In the Matter of the Judiciary's Response to the COVID-19 Outbreak, SCMF-20-0000152, at 2.

Nevertheless, the Majority order assumes that the emergency conditions that caused this court to appoint a special master to act proactively to avoid the spread of COVID-19 in Hawaii's incarcerated community have passed.[15] Majority Order at 3.

The incarcerated citizens of Hawai'i are powerless to comply with the Governor's social-distancing directive. In particular, the women and men held in custody within the O'ahu Community Correctional Center ("OCCC") face a potential COVID-19 catastrophe due to overcrowding that prevents social distancing.[16] Three incarcerated people are often crowded into

---

[15] The Majority reaches the conclusion that, "the rate of new infections in Hawai'i remains at very low levels", presumably to make the point that an emergency no longer exists. As noted, our state is in the grip of a collapsing economy and state-wide social distancing that directly contradicts the underlying assumption of the Majority's order. The June 1, 2020 Department of Health warning that "Covid-19 is spreading globally, nationally, and now locally," recognizes that Covid-19 continues to spread as the state awaits the eventual return of tourists from a world community in the throes of the COVID-19 pandemic. The majority ignores the projections of a second wave of COVID-19 infections emerging as communities begin to relax the precautions taken in response to the first wave of COVID-19 infection.

Chelsea Davis, The struggle between reopening and preventing a second wave of COVID-19 cases, Hawaii News Now (May 22, 2020), https://www.hawaiinewsnow.com/2020/05/23/struggle-between-reopening-preventing-second-wave-covid-cases/.

Len Strazewski, Harvard epidemiologist: Beware COVID-19's second wave this fall, American Medical Association (May 8, 2020), https://www.ama-assn.org/delivering-care/public-health/harvard-epidemiologist-beware-covid-19-s-second-wave-fall.

[16] Although this dissent focuses only on OCCC, the issue of achieving social distancing applies to all correctional facilities in each of Hawai'i's counties.

cells designed for two.[17]  The crowding is so extreme that one prisoner must often sleep on the floor with his head next to the toilet.[18]

According to the 2018 Final Report of the House Concurrent Resolution Task Force on Prison Reform to the Hawai'i Legislature:

> Hawai'i's prisons are old, dilapidated, and severely overcrowded. Hawai'i Community Correctional Center is currently operating at 185% of capacity, Maui Community Correctional Center is operating at 151% of capacity, Kaua'i Community Correctional Center is operating at 196% of capacity, and OCCC is operating at 127% of capacity.  At OCCC, three prisoners are crowded into cells designed for two.  As a result, one of the prisoners must sleep on the floor with his head next to the toilet.  Faced with the lack of available cells, OCCC has so many prisoners crowded into one module that it is known as "Thunderdome." Conditions are so bad throughout the State that most facilities probably do not meet minimum constitutional standards.[19]

OCCC now contains approximately 823 incarcerated citizens in a building designed to accommodate 628 incarcerated people who are not facing the threat of the coronavirus.[20]  The conditions posed by the level of crowding within the inmate population are described by a doctor working within its

---

[17]    Final Report of the House Concurrent Resolution Task Force on Prison Reform to the Hawaii Legislature (2019 Regular Session) 5-6, available at https://www.courts.state.hi.us/wp-content/uploads/2018/12/HCR-85_task_force_final_report.pdf (last visited Mar. 30, 2020).

[18]    Id.

[19]    Id.

[20]    Id.

8

confines.  Doctor Pablo Stewart describes two or three inmates in a cell:

> I have observed that the vast majority of people detained in OCCC are still triple-or at least double-bunked in each cell, which remain dangerously filthy. Making matters worse, correctional staff themselves do not practice social distancing or adhere to proper hygiene protocols.[21]

In his capacity as a doctor providing care in OCCC since July 2019, Dr. Stewart visits OCCC four times a week. He has become "intimately familiar" with OCCC and the response of the Department of Public Safety to the virus.  It is his conclusion that, notwithstanding reports of a decrease in prison population, "people are still crammed two or three to a cell, and hygiene conditions remain abysmal."[22]

---

[21]    Declaration of Pablo Stewart, M.D., filed April 13, 2020 in SCPW-20-213 at 5.

[22]    The Declaration of Pablo Stewart states in relevant part:

> I am intimately familiar with DPS correctional facilities.  Since July 2019, I have been working as the attending psychiatrist supervising psychiatric residents from the John A. Burns School of Medicine Department of Psychiatry, where we provide psychiatric care to people detained at [OCCC].  Also, since the middle of March 2020, I have been visiting and providing care at OCCC at least four times per week.  I thus have become familiar with the jail's conditions and DPS's response to the novel coronavirus.
>
> . . . .
>
> It is from this unique vantage point-as someone who has over three decades of correctional health care experience, who serves as a court-appointed monitor in a prison conditions lawsuit, and who has been inside OCCC as recently as this morning—that I share

(. . . continued)

9

As an experienced court-appointed monitor of prison conditions, Dr. Stewart states that the inmates are not able to practice social distancing. The incarcerated population of OCCC at the time of his April 13, 2020 observations was approximately the same as it is now.[23] As a consequence of the failure to achieve a population reduction sufficient to permit social distancing, Dr. Stewart warns "the present efforts to safeguard against a COVID-19 outbreak within DPS facilities are dangerously inadequate." Thus, he specifically rejects the conclusion of the Majority that the emergency threat of coronavirus within OCCC has ended:

(continued. . . )

> my observations about DPS's efforts to address COVID-19 within its correctional facilities.
>
> . . . .
>
> [W]hile I have heard of DPS reports stating that the OCCC population is smaller than it was a month ago, one would not know that from visiting the facility. As a clinician who moves throughout the facility almost daily, I have not observed any appreciable reduction in the jail population. The end result is that detainees are no more able to maintain social distance and proper hygiene today than they were one month ago.

Id. at 3-6.

[23] The April 8, 2020 Population Report stated that OCCC housed 942 inmates. Initial Summary Report of the Special Master at 27 (Apr 9, 2020). By contrast, the May 28 Fifth Summary Report and Recommendation of the Special Master stated that the population at OCCC was 823, a population of 195 above the design capacity. Fifth Summary Report and Recommendations of the Special Master at 4 (May 28, 2020). [hereinafter Fifth Summary Report].

> DPS's April 9, 2020 advisory notes that OCCC saw a
> 295-person reduction in its jail population between
> March 2, 2020 and April 9, 2020 (*i.e.*, from 1201 to
> 906). See https://twitter.com/HawaiiPSD/status/
> 1248441500901335041. But, based on my OCCC visit
> this morning—*i.e.*, on April 13, 2020—this reduction
> comes nowhere near to allowing for adequate COVID-19
> protocols to be implemented. People are still
> crammed two or three to a cell, and hygiene
> conditions remain abysmal.
>
> . . . .
>
> In short, the present efforts to safeguard against a
> COVID-19 outbreak within DPS facilities are
> dangerously inadequate. I urge the Court not only to
> take action to reduce the jail and prison
> populations, but to do so immediately.

Id. at 8. (emphasis in original).

To protect the inmate population from "the likelihood of a devastating outbreak" and achieve social distancing Dr. Stewart concluded that a population reduction to design capacity is necessary:

> It is clear to me that a much more significant
> population reduction must be achieved within DPS
> facilities. I spent time over the past week
> reviewing the relevant data on DPS jails and prisons.
> Based on that review, and my thirty-plus years of
> expertise in correctional health care oversight, it
> is my opinion that the first step that the Court
> should take is to impose on all stakeholders the
> mandatory goal of reaching 100% of design bed
> capacity.

Id. (emphasis in original).

Consistent with the recommendation of Dr. Stewart, reduction of the incarcerated population at OCCC to design capacity of 628 has been endorsed by this court. To achieve social distancing, this court appointed a special master on April 2, 2020; his scope of work was to "include setting forth

11

guidelines to ensure that the State's correctional centers and facilities are in compliance with social distancing mandates."[24] Consistent with the purpose of achieving social distancing within the inmate population, on April 15, 2020 this court ordered that "[e]fforts shall be undertaken to reduce the inmate population of correctional centers and facilities to design capacity."  Second Interim Order filed April 15, 2020.  Nine days later, we again ordered that "efforts shall continue to be undertaken to reduce the inmate population of correctional centers and facilities to design capacity."  Third Interim Order filed April 24, 2020.

Meaningful progress toward achieving the design capacity of 628 inmates at OCCC did not occur by April 24, 2020.[25]  To date, the inmate population remains over the design capacity.  As

---

[24]     Order of Consolidation and for Appointment of Special Master (By: Recktenwald, C.J., Nakayama, McKenna, Pollack, and Wilson JJ.)  April 2, 2020.

[25]     "There has not been a meaningful decrease in the number of inmates held at the Oahu Community Correctional Center since the initial report of the special master was filed on April 9, 2020.  On April 13, 2020, the head count was 909 and the assigned count was 993.  One week later, on April 20, 2020, the population had increased to a head count of 916 and an assigned count of 1018." Department of Public Safety weekly population report April 13, 2020 and April 20, 2020.  A chart in the April 23, 2020 report of the special master lists the inmate population on April 23, 2020 as 838 at OCCC—a number that is not identified as either a head count or an assigned count.

This court has ordered: "Efforts shall continue to be undertaken to reduce the inmate population of correctional centers and facilities to design capacity." The design capacity of OCCC is 628 inmates. Id. As noted, on April 13, 2020, the head count for OCCC was 909 and, utilizing the chart in the most recent special master's report, the population has decreased no more than seventy-one incarcerated citizens since April 13, 2020." Concurrence Re: Interim Order (By: Wilson J.), April 24, 2020.

described by Dr. Stewart's declaration, the population at OCCC remains dangerously overcrowded. In the 21 days, from May 8 to May 29, 2020, the population increased by 58 inmates for a total of 823 incarcerated women and men. Crowding of cells with up to three inmates has continued. On May 13, 2020, with a population of less than the present population of 823, the Department of Public Safety acknowledged conditions "with up to 3 inmates per cell depending on the daily population."[26]

In the most recent May 28, 2020 Fifth Report of the Special Master, the special master acknowledged that "this process as mandated by the court has been difficult for all involved". The special master noted that communications between the parties had broken down and achievement of design capacity at OCCC to accomplish social distancing among inmates would not be successfully resolved through mediation.[27] The Hawaiʻi State Public Defender and the Oversight Commission[28] consider attainment of design capacity to be essential, while the Attorney General and

---

[26] The incarcerated population on May 13, 2020 was 758. Exhibit 1 Fourth Summary Report and Recommendations of the Special Master, letter of Public Safety Director Nolan Espinda to Special Master (May 15, 2020).

[27] "As of this date, the parties' attempts to resolve this matter through mediation have not been successful". Fifth Summary Report, supra 23 at 3.

[28] Hawaiʻi Correctional Systems Oversight Commission, which was established by the Hawaiʻi State Legislature pursuant to Act 179, Session Laws Hawaiʻi 2019, to, among other things, establish the capacities for all Hawaiʻi correctional facilities and policies and procedures to prevent the inmate population from exceeding the capacity of each correctional facility.

county prosecutors from Oʻahu, Maui and Hawaiʻi oppose any further reduction in population through further release.

Notably, the special master describes a process that, through the innovative collaboration between parties, has already achieved a reduction of the inmate population with an unusual and promising level of protection to public safety:

> The criticism of the recidivism rate on early releases has not taken into consideration what the recidivism rate was prior to the COVID-19 early releases. According to a report of the State of Hawaiʻi Interagency Council on Intermediate Sanctions (July 2018), the average recidivism rate for those released on probation, parole and upon the completion of their sentences is around 50%. Whereas it is too soon to judge the recidivism rate of COVID-19 early releases, about 650 inmates were released and, according to some news outlets, 50 to date have been returned with new charges. That is about an 8% recidivism rate to date, assuming all new charges result in convictions.

Fifth Summary Report at 7.

The special master describes the successful attainment of an eight percent recidivism rate for the over 650 inmates released from incarceration state-wide. The result of the process of release ordered by this court,[29] as calculated by the special master, is a dramatic reduction from the normal recidivism rate of fifty percent to an eight percent recidivism rate-a change that represents far greater protection of the public from repeat criminal activity by the 650 released

---

[29] Every release occurred only after judicial review of the circumstances and facts pertaining to each case—with every adjudication being made only after input from defense counsel and the prosecutor.

14

citizens as compared to the normal reoffending rate for the population of released inmates. The reason for this unusually low recidivism rate is eluded to by the special master as being a result of constructive collaboration:

> The parties and stakeholders have acted admirably under difficult circumstances in carrying out this Court's orders. Differences among them have been great at times, but all have done their best to work in a collaborative fashion as encouraged by this Court, despite their differences.

Id. at 12.

The thorough, informed process of review that preceded the successful release of 650 inmates state-wide is a demonstrated means by which the population of OCCC can be further reduced—safely-- to design capacity.

**II. The Special Master Must Be Permitted to Make Recommendations In Accordance with the Order of this Court that Are Not Conditioned on the Agreement of the Parties.**

It is apparent from the special master's observations and accomplishments in reducing the inmate population thus far, that achieving the original intent of this court's order is attainable. The special master recommends "the parties to continue to work in a collaborative manner to reduce and maintain inmate population levels set by this Court, or by the Oversight Commission should this Court defer to the Commission on this matter". Id. at 12. However, the special master notes that an impasse to achieving inmate population levels has arisen and he is prevented from recommending necessary solutions by his

15

perception that his recommendations can only be based on consensus.  As a consequence, he has thus far declined to provide recommendations to this court with which the parties do not agree:

> Because the Special Master has been mandated to work in a collaborative manner with the parties and stakeholders, and conduct mediation among the parties when appropriate, the Special Master cannot pick a side in these proceedings when the parties differ, while continuing to work collaboratively with the parties consistent with the orders of this Court. The Special Master has endeavored to work with the parties in an evenhanded manner while carrying out the orders of this Court.

Fifth Summary Report at 12.

Thus, the special master is not aware that he does in fact have the authority and duty to provide this court with his independent recommendations regardless of whether the parties agree.  His appointment purpose as stated in this court's original order appointing the special master is to "effectuate the goals of these consolidated proceedings, even without agreement of all parties."[30]  The special master has an important responsibility to provide this court with independent recommendations not conditioned on consensus.  Informed by his two months of active service, the recommendations of the special master could be of great benefit to the court and the community

---

[30]    Order of Consolidation and for Appointment of Special Master (By: Recktenwald, C.J., Nakayama, McKenna, Pollack, and Wilson JJ.) (Apr. 2, 2020) at 7.

16

to counter the threat of COVID-19 posed by (1) present conditions of incarceration and (2) an increased likelihood of infection among incarcerated citizens from the return of visitors from the United States and abroad.

The special master's constructive communication with problem solving community groups and vigilant concerned community leaders[31] uniquely positions him to provide innovative candid recommendations—recommendations that could prove critical to resolving the COVID-19 emergency in our correctional institutions. The special master's commitment to overcome the present impasse and achieve conditions of incarceration permitting social distancing is reflected in his recommendation that he submit a further report on June 11, 2020. It is evident that to forego the special master's report and his independent recommendations that will be forthcoming in only seven days would be a rush to judgment at great sacrifice to achieving constitutionally safe conditions for incarcerated citizens.

---

[31] The Fifth Master's report recounts active input and communication with the State House Committee on Public Safety, Veterans & Military Affairs, the Attorney General, prosecutors from Honolulu, Maui, and Hawaiʻi, the Hawaiʻi State Public Defender, the Hawaiʻi Correctional System Oversight Commission, and the Emergency Reentry Project.

**III. Reduction of the Population of Incarcerated Citizens at OCCC is Necessary to Prevent the Spread of the COVID-19, Remedy Constitutional Violations, and Protect the Community.**

Incarcerated citizens have a constitutional right to be free from cruel and unusual punishment.  U.S. Const. amend. VIII; Haw. Const. art. I, § 8 (incorporating the same).  To establish a violation of the Eighth Amendment, an inmate must show that prison officials are "knowingly and unreasonably disregarding an objectively intolerable risk of harm, and that they will continue to do so . . . into the future."  Farmer v. Brennan, 511 U.S. 825, 846 (1994).

The "deliberate indifference" needed to establish an Eighth Amendment violation must be examined "in light of the prison authorities' current attitudes and conduct," Helling v. McKinney, 509 U.S. 25, 36 (1993), which means "their attitudes and conduct at the time suit is brought and persisting thereafter[.]"  Farmer, 511 U.S. at 845.  The U.S. Supreme Court has held that overcrowding in a prison that deprives "prisoners of basic sustenance, including adequate medical care[,]" violates a prisoner's right to be free from cruel and unusual punishment under the Eighth Amendment.  Brown v. Plata, 563 U.S. 493, 511 (2011) ("Just as a prisoner may starve if not fed, he or she may suffer or die if not provided adequate medical care").  Courts have a responsibility to remedy Eighth Amendment violations when jails are overcrowded and inmates are not

18

receiving adequate medical care.  Id.  ("If government fails to fulfill this obligation, the courts have a responsibility to remedy the resulting Eighth Amendment violation").  Although courts must consider public safety in ordering inmate releases, "[c]ourts may not allow constitutional violations to continue simply because a remedy would involve intrusion into the realm of prison administration."  Id. at 511.  Additionally, courts and state officials "must bear in mind the need for a timely and efficacious remedy for the ongoing violation of prisoners' constitutional rights."  Id. at 543.

In Plata, the Court concluded that the overcrowding of inmates bred unconstitutional conditions within the prison: inadequate medical care that resulted in death, the increased incidence of infectious disease, and needless pain and suffering.  563 U.S. at 519-20.  Thus, the Court held that remedial measures to cure the cruel and unusual conditions in the California prisons were warranted.  Id.  To remedy the violation of the incarcerated populations' right to be free from cruel and unusual punishment, the United States Supreme Court upheld the lower court's order placing a cap on the prison's population.  Id. at 545.  The Supreme Court concluded that courts may enter an order placing limits on prison populations when medical care cannot adequately meet the demands of an overcrowded inmate population.  Id.  The Court capped the prison

19

population to cure and prevent Eighth Amendment violations, and thus had the "effect of reducing or limiting the prison population" by up to "46,000 persons." Id. at 510-11.

The threat to the incarcerated citizens of OCCC is more dire than the threat to California's incarcerated citizens in Plata. As in Plata where the correctional facilities in California were operating in excess of their design capacity and therefore exposing inmates to overcrowding that caused death and harm, 563 U.S. at 502, OCCC is also operating significantly in excess of its capacity, thus creating similar unconstitutional conditions; inmates are crowded two to three in a cell and unable to social distance. However, in this case, the current COVID-19 pandemic is a more lethal threat—an officially declared state and national emergency—that eclipses the cruel and unusual conditions of overcrowding and inadequate medical care at issue in Plata. The conditions in Plata did not include the potentially lethal threat of Covid-19.

Incarcerated citizens are exposed to the threat of contracting COVID-19 at a rate significantly higher than someone in the general community.[32] The speed with which the virus moves through prisons and jails is rapid, with many infected people

---

[32] See, e.g., COVID-19 infection rate on Rikers Island is 7 times higher than citywide according to the Legal Aid Society, CBS N.Y. (Mar. 20, 2020) https://newyork.cbslocal.com/2020/03/26/coronavirus-rikers-island/.

spreading the virus before ever showing symptoms. For example, the virus spread through Rikers Island jail ("Rikers") in New York from one inmate to 167 in just ten days.[33] In the same period of time, the virus infected 137 Rikers staff members.[34] Jails and prisons are "basically a system designed to spread communicable disease,"[35] unless corrective and preventative action is taken. Whether the state of Hawai'i is acting with deliberate indifference to the threat of COVID-19 is a threshold issue dependent in part on the recommendations and observations of the special master.

Courts throughout the United States have acted promptly in response to the threat the coronavirus poses to incarcerated people. Cuyahoga County, Ohio, dropped the county jail population from nearly 1,900 to less than 1,300 "in a matter of days", with Cuyahoga County Presiding Judge Brendan J. Sheehan noting that "[w]e really compacted the time frame."[36] Likewise, New Jersey released as many as 1,000 people from its

---

[33] Jennifer Gonnerman, How Prisons and Jails Can Respond to the Coronavirus, NEW YORKER (Mar. 14, 2020), https://www.newyorker.com/news/q-and-a/how-prisons-and-jails-can-respond-to-the-coronavirus.

[34] Id.

[35] Id.

[36] Kimberly Kindy, Disaster waiting to happen: Thousands of inmates released as jails and prisons face coronavirus threat, WASH. POST (Mar. 25, 2020), https://www.washingtonpost.com/national/disaster-waiting-to-happen-thousands-of-inmates-released-as-jails-face-coronavirus-threat/2020/03/24/761c2d84-6b8c-11ea-b313-df458622c2cc_story.html.

jails to address the risks of the highly contagious coronavirus spreading among the incarcerated population.[37]  New Jersey's chief justice, Stuart Rabner, signed an order releasing inmates jailed for probation violations as well as those convicted in municipal courts or sentenced for low-level crimes in Superior Court.[38]

## IV.  Reduction of OCCC Population to Design Capacity.

Releasing incarcerated nonviolent citizens to achieve numbers sufficient to reduce the population of OCCC to its design capacity of 628 is straightforward.  With a present inmate population of 823 people, the release of approximately 194 women and men can be achieved with due consideration for public safety by:  (1) releasing low-risk pretrial detainees and placing them on court supervised release; (2) releasing low-risk inmates who are close to finishing their sentences either by modifying their sentence to end without further incarceration; (3) modifying the remaining sentence of nonviolent offenders to be served as a period of probation; or (4) transferring inmates to other custodial settings.

---

[37]  Tracey Tully, 1,000 Inmates Will Be Released From N.J. Jails to Curb Coronavirus Risk, N.Y. TIMES (Mar. 23, 2020), https://www.nytimes.com/ 2020/03/23/nyregion/coronavirus-nj-inmates-release.html?smid=em-share.

[38]  Id.

The length of sentence for nearly every inmate in OCCC is presently less than twelve months. With rare exceptions, all sentences being served are either as a result: (1) of a conviction for a nonviolent Class C felony with no more than a year remaining on a probationary sentence; (2) a misdemeanor punishable for no more than a year in jail,[39] or; (3) a petty misdemeanor punishable by no more than thirty days in jail.[40] Thus, each inmate currently serving a sentence at OCCC will have finished their sentence within twelve months, even without an early release in the face of the threat of COVID-19.

Low-risk nonviolent offenders should be released and/or be subject to an alternative probationary sentence. To subject citizens presently serving terms for petty misdemeanors, misdemeanors, or non-violent class C felonies to the lethal threat of COVID-19, notwithstanding the availability of an alternative probationary sentence, is an unconstitutional violation of their right to be free from cruel and unusual punishment.

Faced with the threat to their lives, and the inability to engage in social distancing amidst the coronavirus

---

[39] See HRS § 701-107(3) (providing that misdemeanors are punishable by a maximum imprisonment of one year).

[40] See HRS § 701-107(4) (providing that petty misdemeanors are punishable by a maximum imprisonment of thirty days).

23

pandemic, no benefit to the community is achieved from continued incarceration of those serving time for a petty misdemeanor, a misdemeanor, or a nonviolent class C felony.  Commission of a petty misdemeanor, a misdemeanor, or a nonviolent class C felony does not warrant as punishment the exposure to a virus that will possibly kill the incarcerated citizen, and will likely require expenditure of valuable life-saving medical resources.  Inmates serving terms for petty misdemeanor, misdemeanors, or nonviolent class C felonies can have their sentences modified to allow completion of the remaining sentence on court supervised probation, or to be released based on the time served on the sentence.  Protection of the public is provided by adjudication of every proposed release.

The remaining incarcerated citizens at OCCC are pretrial detainees who have not been convicted of a crime; they are citizens presumed to be not guilty, who are awaiting trial in jail because they could not afford to post bail.  To subject citizens arrested for, but not convicted of, petty misdemeanors, misdemeanors, or nonviolent class C felonies to the lethal threat of COVID-19 because they are unable to post bail is an unconstitutional violation of their right to be free from cruel and unusual punishment.

The jailing of (1) citizens awaiting trial for nonviolent offenses and (2) nonviolent offenders with less than

24

a year remaining on their sentences not only contributes to the vast overcrowding in Hawaiʻi correctional facilities and increases the risk to inmates of contracting COVID-19, their incarceration also threatens: (1) the health and safety of correctional workers and public defenders who share the company of the incarcerated citizens; (2) the state's limited medical teams whom would have to respond to a coronavirus outbreak emergency in the correctional facilities and hospitalize inmates; and (3) the state's limited medical supplies and testing kits.

## V. CONCLUSION

The special master recognizes the impasse to resolving the coronavirus emergency at OCCC, and nonetheless recommends that the parties continue to work to reduce and maintain population levels set by this court. In so doing he notes the difficulty of resolving the COVID-19 threat if he is constrained to offer only recommendations arrived at by consensus. Fortunately, the special master was provided just the authority he mistakenly laments that he is without—the authority to "effectuate the goals of these consolidated proceedings, even without agreement of all parties." So empowered, and with the experience of two months of hard and productive work, he should be permitted to submit his independent recommendations about how to resolve the emergency faced by Hawaiʻi's incarcerated women

25

and men.  Perhaps the reaffirmation of the importance of independent authority will be reason for a future special master--faced with the present emergency and the increased risk of infection from an imminent influx of tourists--to perform an independent site visit of OCCC to see first-hand the crowding and social distancing, if any, employed by inmates and correctional workers.

The alternative chosen by the Majority--to declare success and claim contrary to the evidence and the Governor's emergency orders that the emergency is at an end--perpetuates without justification the lethal risk of infection to those who are held sometimes three to a cell during the coronavirus pandemic emergency.  The emergency identified by the Governor and specifically described within OCCC by Dr. Stewart requires this court to maintain jurisdiction at least until the special master is granted the opportunity to make independent recommendations about how to reduce population levels sufficiently to achieve social distancing.

Dated: Honolulu, Hawai'i, June 5, 2020.

/s/ Michael D. Wilson

Associate Justice



26